STATE OF NORTH CAROLINA v. PHILLIP ANTWAN DAVIS

No. 109A98

(Filed 21 December 2000)

**1. Constitutional Law— right to be present at trial—capital sentencing—communications from jury**

The trial court in a capital sentencing proceeding did not violate defendant's constitutional rights to be present at his trial in its handling of a note from the jury inquiring about the result of an inability to agree and a note from one juror asking to be removed. Defendant was present when the proceeding took place, the court promptly and adequately summarized the jury's question and the note from the juror, and the court heard from counsel and responded in open court to each of the communications.

**2. Constitutional Law— effective assistance of counsel—capital sentencing—notes from jury—disclosure of content**

A first-degree murder defendant was not deprived of his constitutional rights to effective assistance of counsel at his capital sentencing hearing by the court's refusal to disclose the exact content of a note from the jury inquiring into the result of an inability to reach a decision and a note from a juror asking to be replaced. The fair and accurate disclosure of the content of the note was sufficient to render counsel the full opportunity to rep-

1

**STATE v. DAVIS**

[353 N.C. 1 (2000)]

resent defendant and defense counsel had the opportunity to object to the proposed instruction on replacing a juror.

### 3. Criminal Law— capital sentencing—notes from jury—ex parte communications

The trial court's handling of notes from the jury in a capital sentencing proceeding did not violate N.C.G.S. § 15A-1234(a)(1) or a canon of the Code of Judicial conduct regarding ex parte communications.

### 4. Evidence— capital sentencing—defendant's character—admissible

The trial court did not err in a capital sentencing proceeding by admitting testimony regarding defendant's temperament, a fight with his girlfriend at work, an alleged statement by defendant that he smoked marijuana, and a high school homework assignment that showed defendant's knowledge of drugs.

### 5. Evidence— capital sentencing—statement by a child to an officer

There was no plain error in a capital sentencing proceeding in the admission of testimony that a foster child in the victim's home had told an officer that the person who shot the victim had pointed a gun at her.

### 6. Sentencing— capital—aggravating circumstance—especially heinous, atrocious, or cruel—victim's good character

The trial court did not err in a capital sentencing proceeding by admitting evidence of the good character of one of the victims. Evidence that defendant had murdered a blood relative who had opened her home to him, offered him a stable environment, and been especially caring, patient, and loving supported the aggravating circumstance that the killing was especially heinous, atrocious, or cruel and did not "go too far" within the meaning of *State v. Reeves*, 337 N.C. 700.

### 7. Evidence— cross-examination—character evidence

The trial court did not abuse its discretion in a capital sentencing proceeding by allowing prosecutors to cross-examine defense witnesses regarding defendant's bad character in rebuttal of defendant's evidence of good character.

### 8. Evidence— capital sentencing—cross-examination—hearsay

The trial court did not abuse its discretion and there was no plain error in a capital sentencing proceeding in permitting the

STATE v. DAVIS

[353 N.C. 1 (2000)]

State on cross-examination to elicit testimony that the witness had been told by a teacher that the teacher had heard that defendant had been in trouble and had been aggressive towards another teacher. The evidence served to rebut evidence that defendant was not a behavior problem at school and there was no error so fundamental that justice could not have been done.

### 9. Evidence— capital sentencing—food eaten by defendant in jail

There was no plain error in a capital sentencing proceeding in the admission of testimony on cross-examination regarding the food defendant ate in jail, including numerous candy bars, soft drinks, and snacks.

### 10. Evidence— capital sentencing—defendant dangerous in future

There was no plain error in a capital sentencing proceeding in the admission of testimony that defendant could be dangerous in the future under certain circumstances and that prison inmates make and use knives while many prison employees are unarmed.

### 11. Evidence— capital sentencing—victim's good character

Evidence in a capital sentencing proceeding of the good character traits of the victim did not go too far for purposes of State v. Reeves, 337 N.C. 700, nor did it violate defendant's constitutional right to a fundamentally fair trial.

### 12. Evidence— capital sentencing—victim impact evidence

Limited victim impact evidence introduced in a capital sentencing proceeding did not go too far and was not so unduly prejudicial that it rendered the trial fundamentally unfair.

### 13. Evidence— capital sentencing—prosecutor's questions— no plain error—previously admitted

There was no error in a capital sentencing proceeding where defendant contended that the trial court erred by allowing the prosecutors to ask badgering and impertinent questions, but there was no plain error regarding many of the questions (the failure to object or to move to strike following a sustained objection limits review to plain error) and there was no error as to the remaining questions because defendant had previously injected

the evidence into the proceeding or allowed it to be admitted earlier without objection.

### 14. Evidence— capital sentencing—defendant's letters to his mother

There was no prejudicial error in a capital sentencing proceeding where the court excluded letters and cards written from defendant to his mother after his incarceration. Defendant was allowed to present evidence of remorse and a loving relationship with his mother and the letters would have offered substantially the same evidence. In any event, the letters were unreliable in that they were written by a defendant facing a capital sentencing proceeding to a likely witness in the proceeding.

### 15. Evidence— capital sentencing—positive impact by defendant

The trial court did not err in a capital sentencing proceeding by excluding testimony that defendant would make a positive impact on society in prison where the testimony was purely speculative and where the court admitted evidence that defendant was a leader to a young friend and had a positive impact on people on and off the football field.

### 16. Criminal Law— prosecutor's argument—capital sentencing—biblical

The prosecutor's biblical arguments in a capital sentencing proceeding were not so improper as to require intervention ex mero motu where the prosecutor counseled jurors that they should base their sentencing decision on the secular argument.

### 17. Criminal Law— prosecutor's argument—capital sentencing—jury as conscience of community

There was no prejudicial error in a capital sentencing proceeding in the prosecutor's argument that the jurors must not lend an ear to the community but may act as the voice and conscience of the community. Although defendant contended that the prosecution instructed the jury to disregard defense testimony, and the prosecutor's statement was not clear, any confusion was cured by the court's instruction on the jury's duty to consider mitigating circumstances.

**18. Criminal Law— prosecutor's argument—capital sentencing—traveling outside the record**

A prosecutor's argument in a capital sentencing proceeding was not so improper as to require intervention ex mero motu where defendant contended that the prosecutor traveled outside the evidentiary record.

**19. Criminal Law— prosecutor's argument—capital sentencing—defendant's mannerisms**

A prosecutor's comments about defendant's mannerisms in the courtroom during a capital sentencing proceeding did not constitute references to the defendant's constitutional right to remain silent.

**20. Sentencing— capital—aggravating circumstance—murder during robbery—instruction—timing**

There was no prejudicial error in a capital sentencing hearing in the trial court's instruction on the N.C.G.S. § 15A-2000(e)(5) aggravating circumstance (that the capital felony was committed while defendant was engaged in the commission of robbery) where the trial court failed to charge the jury with sufficient clarity that the State had the burden to show that the criminal conduct took place during the same transaction as the murder. However, all of the evidence tended to show that the murder and armed robbery were part of a continuous series of events, the trial court properly instructed the jury that it could find this aggravating circumstance if it determined that the armed robbery occurred during a continuous series of events surrounding the victim's death, and the issues and recommendation form asked whether the murder was committed by defendant while defendant was engaged in the commission of armed robbery; thus, the instructions and the issues and recommendation form, considered in light of the evidence, communicated to the jury that the murder had to occur while defendant was engaged in the commission of armed robbery. There is no reasonable likelihood that the jury applied the challenged instruction in a manner that violated the Constitution.

**21. Sentencing— capital—aggravating circumstance—pecuniary gain—not required to be primary motive**

The trial court did not err in a capital sentencing proceeding in its instruction on the pecuniary gain aggravating circumstance,

STATE v. DAVIS

[353 N.C. 1 (2000)]

N.C.G.S. § 15A-2000(e)(6), by charging the jury that it did not have to find that the primary motive was financial gain.

**22. Sentencing— capital—mitigating circumstance—no significant history of prior criminal activity—instructions**

There was no plain error in a capital sentencing proceeding in the court's instruction on the mitigating circumstance of no significant history of prior criminal activity, N.C.G.S. § 15A-2000(f)(1). Even if the instructions assumed that defendant engaged in prior criminal activity, overwhelming evidence was presented that defendant had engaged in the listed criminal activity and the trial court did not assume the jury's duty to determine whether defendant's history was significant.

**23. Sentencing— capital—mitigating circumstances—peremptory instructions—evidence controverted**

The trial court did not err in a capital sentencing proceeding by refusing to give peremptory instructions on four mitigating circumstances where the evidence of the circumstances was controverted.

**24. Sentencing— capital—life imprisonment—instruction**

The trial court in a capital sentencing proceeding did not err in its instructions by not using the phrase "life imprisonment without parole" rather than "life imprisonment" every time it referred to the alternative to death. The judge instructed the jury that a sentence of life imprisonment means a sentence of life without parole; nothing in N.C.G.S. § 15A-2002 requires the judge to state "life imprisonment without parole" every time he alludes to or mentions the alternative sentence.

**25. Criminal Law— reference to "our" district attorney—not an expression of opinion by judge**

The trial judge in a capital sentencing proceeding did not violate N.C.G.S. § 15A-1222, which prohibits the expression of an opinion by the judge on any question of fact to be decided by the jury, in referring to the district attorney's office and the district attorney with "our" and "your" during jury selection. Whether the prosecutor is "our" or "your" district attorney is not a question of fact to be decided by the jury.

**26. Sentencing— capital—aggravating circumstances—pecuniary gain—murder during armed robbery—not double counted**

The trial judge did not err in a capital sentencing proceeding by submitting both the pecuniary gain aggravating circumstance and the aggravating circumstance that the murder was committed while defendant was engaged in an armed robbery where both circumstances were supported by sufficient, independent evidence and the trial court properly instructed the jury that it could not use the same evidence as the basis for both circumstances.

**27. Appeal and Error— prosecutor's statements—failure to object—no plain error analysis**

The defendant in a capital sentencing proceeding waived appellate review of the prosecutor's statements during jury selection regarding the State's burden of proof by failing to object. Plain error analysis has been applied only to instructions to the jury and to evidentiary matters.

**28. Constitutional Law— capital sentencing—right to testify—examination of defendant by court—right to cross-examination**

The trial court in a capital sentencing proceeding did not impermissibly chill defendant's right to testify with its reference to cross-examination in its inquiry into whether defendant had discussed testifying with his lawyers.

**29. Homicide— first-degree murder—short-form indictment**

The short-form indictments used to charge defendant with first-degree murder were constitutional.

**30. Discovery— capital sentencing—written statement and copies of notes by defense expert**

The trial court did not err in a capital sentencing proceeding by ordering defendant's mental health expert to prepare a written report of his findings and to produce handwritten notes for the State's perusal pursuant to N.C.G.S. § 15A-905(b) where defendant was given access to the State's files.

**31. Discovery— attorney-client privilege—self-incrimination—notes and report from defense expert**

A trial court order in a capital sentencing proceeding requiring defendant's mental health expert to prepare a written report

STATE v. DAVIS

[353 N.C. 1 (2000)]

of his findings and to produce for the State handwritten notes did not violate defendant's attorney-client privilege and privilege against self-incrimination. Nothing indicates that the expert examined or communicated with defendant in the course of seeking or giving legal advice and, even if the expert was an agent of defendant's attorneys, he clearly lost that privilege once he was placed on the witness stand. Moreover, the court is always at liberty to compel disclosure of privileged communications if necessary to a proper administration of justice.

**32. Sentencing— capital—death sentence—not imposed arbitrarily**

The record in a capital sentencing proceeding fully supports the aggravating circumstances submitted to and found by the jury and there was no indication that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary consideration.

**33. Sentencing— capital—death sentence—not disproportionate**

A sentence of death was not disproportionate where defendant stole from the victim after being taken into her home; without adequate provocation, he furtively waited in her home for her to return so that he could shoot her; and, while she was attempting to call for help, he hacked her to death with a meat cleaver in the presence of her two foster children. The case is not substantially similar to any of the cases where the death penalty was found disproportionate, there is no question of the specific intent to kill, and the victim was killed in her own home.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Payne Ronald K., J., on 21 August 1997 in Superior Court, Buncombe County, following a plea of guilty of first-degree murder. On 24 September 1999, the Supreme Court allowed defendant's motion to bypass the Court of Appeals as to his appeal of an additional judgment imposing a sentence of life imprisonment without parole following a second plea of guilty of first-degree murder. Heard in the Supreme Court 16 May 2000.

*Michael F. Easley, Attorney General, by G. Patrick Murphy, Special Deputy Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Daniel R. Pollitt and Danielle M. Carman, Assistant Appellate Defenders, for defendant-appellant.*

**STATE v. DAVIS**

[353 N.C. 1 (2000)]

FRYE, Chief Justice.

On 4 August 1997, defendant pled guilty to the first-degree murders of his aunt, Joyce Miller, and cousin, Caroline Miller. Following the entry and acceptance of the guilty plea, a capital sentencing proceeding was conducted pursuant to N.C.G.S. § 15A-2000. The jury recommended a sentence of death for the murder of Joyce Miller and life imprisonment without parole for the murder of Caroline Miller. In the Joyce Miller case, the jury found as aggravating circumstances that the murder was: (1) committed while engaged in the commission of armed robbery; (2) committed for pecuniary gain; (3) especially heinous, atrocious, or cruel; and (4) part of a course of conduct, including the commission of other crimes of violence against other persons. The jury also found fifteen of the fifty statutory and nonstatutory mitigating circumstances submitted to it. In the Caroline Miller case, the jury found as aggravating circumstances that the murder was: (1) committed while engaged in the commission of armed robbery; and (2) part of a course of conduct, including the commission of other crimes of violence against other persons. The jury also found eighteen of the fifty statutory and nonstatutory mitigating circumstances submitted to it.

On 21 August 1997, the trial judge, in accordance with the jury's recommendation, imposed a sentence of death for the first-degree murder conviction of Joyce Miller and a sentence of life imprisonment without parole for the first-degree murder conviction of Caroline Miller.

Defendant makes thirty-two arguments on appeal to this Court. For the reasons discussed herein, we reject each of these arguments and conclude that defendant's capital sentencing proceeding was free of prejudicial error and that the death sentence is not disproportionate. Accordingly, we uphold defendant's convictions and sentence of death.

The State's evidence in the capital sentencing proceeding tended to show the following facts and circumstances. Defendant, who was eighteen years old, was living in the home of his aunt, Joyce Miller (Miller), in Asheville, North Carolina. Also residing in Miller's home were Miller's seventeen-year-old daughter, Caroline Miller (Caroline), and two young foster children.

Approximately one week before the murders, Miller told her brother, Billy Davis that she was missing $800.00. Caroline believed that defendant had taken the money because he had recently pur-

STATE v. DAVIS

[353 N.C. 1 (2000)]

chased clothing and a gold chain. Miller obtained a receipt for the clothes and returned them. Caroline was hiding the gold chain from defendant so that she and Miller could take it to a pawn shop. Several days before the murders, defendant stated to Caroline, "Well, if I don't get my chain, it's only going to hurt you in the long run."

On 24 May 1996, defendant shot and killed his cousin Caroline. On the same day, he killed Miller by shooting her and cutting her with a meat cleaver. Davis visited Miller's home in the evening and found Miller lying in a pool of blood. Niconda Briscoe, defendant's girlfriend, arrived at approximately the same time as Davis and called for emergency assistance.

A paramedic with the Buncombe County Emergency Medical Service arrived at the Miller residence at 7:32 p.m. He noted blood smeared on the outside of the door. He discovered severed fingers on the floor in the foyer and Miller's body in a large pool of blood. The two foster children were in the living room looking into the foyer. As the paramedic entered the living room to escort the children out, he observed Caroline in her bedroom on the bed. After checking her pulse, he determined that she, too, was dead.

Meanwhile, between 7:30 and 8:00 p.m., defendant attempted to cash a check in the amount of $360.00, bearing the name of Miller's former husband, at the Bi-Lo grocery store on Hendersonville Road. The manager refused to cash it, as she did not believe it was legitimate. According to the manager, defendant appeared to be "really calm."

At approximately 8:00 p.m., defendant went to Dillard's in the Asheville Mall and tried on clothing in the men's department. The sales receipt showed that defendant purchased six clothing items at 8:08 p.m. for $231.61 using a credit card in Miller's name. When questioned by the cashier, defendant told her that the credit card belonged to his aunt and that she knew he was using it. Two of the items defendant purchased were identical to the ones Miller had returned several days prior to the murders.

At 8:21 p.m., a driver for the Blue Bird Cab Company was dispatched to the Amoco station on Hendersonville Highway. A person matching defendant's description approached the driver and said, "It's me. I'll be with you in a couple minutes." He returned with two bags and asked the driver to take him to Pisgah View Apartments.

Defendant entered unit 29-D of Pisgah View Apartments; showed an acquaintance, Felicia Swinton, the clothes he had purchased; changed clothes; and left to attend a party in West Asheville. He spent approximately twenty minutes in Swinton's apartment and acted "normal."

Kendall Brown and Ryan Mills, friends of defendant's, heard that Miller and Caroline had been murdered and went to the party to pick up defendant. During the ride back to the Miller residence, defendant asked Brown if it "was . . . true about the murders" and said he "wanted to know what all had happened." When they arrived at the residence, defendant sat on the curb; started crying; and said, "Please don't let them take me."

Later that evening, Sergeant David Shroat took a statement from defendant at the Asheville Police Station. Defendant first told Sergeant Shroat that he did not know what had happened; then blamed others; and finally stated, "My life is over; I did it."

Defendant described the following series of events to the detectives. Earlier in the week, defendant found a gun in the closet and test-fired it in the back yard. At approximately 5:30 p.m. on 24 May 1996, he entered Caroline's bedroom with the gun in order to get his clothes. Caroline was lying on her bed. He went to the right side of the bed, pointed the gun at her, and fired twice. He then walked around to the other side of the bed and fired a third shot at her. After killing Caroline, defendant ate a sandwich and watched television. Miller arrived at the residence at approximately 7:00 p.m. with the two foster children. When defendant heard her entering, he hid behind the door. After she entered, defendant shot her in the back. He shot Miller only one time because he had "[n]o more bullets." Miller attempted to reach the telephone, but defendant pulled the cord from the receptacle. When she tried to leave the house, he took a meat cleaver from the kitchen and struck her with it ten or twelve times with his eyes closed as he stood on top of her in the foyer.

Immediately thereafter, defendant placed his clothes in a white plastic garbage bag along with the meat cleaver. He took two VCRs, one from Caroline's bedroom and one from Miller's, and put them in another plastic bag along with Miller's brown purse. He also took Miller's black purse. At approximately 7:15 p.m., he placed the two plastic bags on the front passenger floorboard of Miller's vehicle. Defendant then drove to the Asheville Mall, where he used Miller's credit cards to purchase clothing.

From the Asheville Mall, defendant drove to Oak Knoll Apartments and placed the two plastic bags in the Dumpster. He then drove to the Amoco station, where he threw the black purse and the gun into a wooded area behind the station. He told the taxi cab driver whom he had called that he would be there in a minute, returned to Miller's vehicle, and retrieved the shopping bags containing the clothing he had purchased at Dillard's.

Defendant left Miller's vehicle at the Amoco station and traveled in the taxi to Pisgah View Apartments, where he changed clothes. He then put the stolen credit cards and keys to Miller's vehicle in a garbage can near Swinton's apartment. Defendant drove around downtown Asheville with his friend Kelby Moore and smoked marijuana.

At 10:30 p.m., defendant arrived at the party in west Asheville. Defendant danced for a while at the party before Brown and Mills took him to Miller's residence. Upon completing his statement, defendant went to sleep under the table in the interview room.

The autopsy of Miller revealed that she had a single gunshot wound to the left side of the head, amputation of two fingers, and fifteen individual and clustered injuries consistent with being inflicted by a meat cleaver. The autopsy of Caroline revealed three separate gunshot wounds, one to the head with stippling around the entrance wound indicating a close range shot; one to the chest; and one to the arm.

Investigators found that Caroline's bedroom was in disarray and that a VCR and television were missing. A large amount of cash and some jewelry were discovered in a book bag in Caroline's room. In Miller's bedroom, drawers had been pulled out and items had been dumped on the bed. Investigators found an empty jewelry box, a checkbook, and a box of checks on the floor. A second VCR was missing from the entertainment center in Miller's bedroom. Miller's truck, a red Bravada, was also missing.

Police officers recovered two VCRs, jewelry, clothes, a bloody meat cleaver, and a brown purse containing Miller's bank cards from a Dumpster at the Oak Knoll Apartments. Additionally, they found Miller's credit cards in a trash bag near Pisgah View Apartments. Miller's Bravada truck, two gloves, a black purse, and a Colt .32 revolver with five spent casings in the cylinder were discovered near the Amoco station.

While defendant did not testify at the capital sentencing proceeding, several witnesses testified on his behalf. Defendant's evidence tended to show the following. Defendant's mother was a drug addict, habitual felon, and mental patient who could not care for him, and his father took no responsibility for him. Since his childhood, defendant alternated between the homes of friends and relatives because his mother was periodically incarcerated or incapacitated. Defendant was a good athlete, but his parents never attended his athletic or school events. When he was thirteen years old, defendant sustained a closed-head injury when he intervened in an argument between his mother and a drug addict, who hit defendant with a baseball bat.

In the summer of 1995, defendant moved in with Miller and Caroline and obtained a job at a Food Lion grocery store. He made the school football team and stopped working in September when football season began. Teammates described defendant as a leader and a hard worker. In December of 1995, defendant began working as a bag boy at a Bi-Lo grocery store where he was described as a good worker. Defendant's high school principal described him as a normal and well-behaved student. Defendant was "on track" to graduate from high school, was accepted into North Carolina A&T State University, and had passed an Air Force entrance test.

There was constant rivalry between defendant and Caroline to the extent that Caroline packed up defendant's belongings on more than one occasion. There was also tension between defendant and his aunt. On one occasion, Miller pointed a pistol at defendant and said that when she gave him an order, "she expected it to be done." Witnesses described defendant as remorseful and noted that he cried whenever he discussed the murders.

A clinical psychologist, Dr. Jerry Noble, testified as an expert witness. Dr. Noble performed a postarrest evaluation and determined that defendant's basic psychological, emotional, and nurturing needs had been neglected. Defendant had an IQ of only 78, but he never repeated a grade or had any special-education classes. According to Dr. Noble, defendant had four significant mental disorders on 24 May 1996: (1) borderline intellectual functioning, (2) borderline personality disorder, (3) cannabis abuse, and (4) acute stress disorder. The borderline personality disorder caused defendant to be emotionally unstable and impulsive and to have difficulties in interpersonal relationships. Dr. Noble described defendant as anxious, depressed,

immature, and prone to unravel during periods of stress. Defendant's conduct in eating a sandwich and watching television after he killed Caroline was consistent with acute stress disorder, disassociation, and derealization. According to Dr. Noble, defendant could not fully remember, did not understand, and was genuinely bewildered about Miller's death. Following the homicides, defendant exhibited suicidal thoughts, increased interest in religion, and signs of remorse. Dr. Noble opined that defendant was under the influence of a mental or emotional disturbance at the time of the murders and that his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired.

Defendant appeals to this Court as of right from the judgment imposing a sentence of death for the first-degree murder of Miller. Additionally, this Court allowed defendant's motion to bypass the Court of Appeals as to his appeal of the judgment imposing a life sentence without parole for the first-degree murder of Caroline.

## I. CAPITAL SENTENCING PROCEEDING

[1] In his first argument, defendant contends that the trial court violated state and federal constitutional law during sentencing deliberations by responding improperly to: (1) the jury's question about the result of an inability to agree, and (2) a juror's letter indicating an inability to continue as a member of the jury. We cannot agree.

During deliberations, the jury sent a note to the court as follows: "Could we be furnished the last two paragraphs of Judge Payne's charge to the jury! re: Our final decision[?] On Issue (4) four[,] if we are 11 to one for death what happens[?]" Upon receiving the note, the court informed counsel that it had received a note from the jury and that the jury had a question "asking for 'what happens if there's a division on the fourth issue.' " Counsel for defendant asked the court to instruct the jury about what happens if the jury is unable to agree. The court denied the request, and defendant objected. Without ruling on the objection, the trial court called the jurors back into the courtroom and instructed them on Issue Four a second time.[1] Furthermore, the court instructed the jury as follows:

---

1. Issue Four reads, in pertinent part, as follows: "Do you unanimously find, beyond a reasonable doubt, the aggravating circumstance or circumstances you've found is or are sufficiently substantial to call for the imposition of the death penalty when considered with the mitigating circumstance or circumstances found by one or more of you?"

**STATE v. DAVIS**

[353 N.C. 1 (2000)]

Now, members of the jury, I would also instruct you that as to the other question that you have submitted to me, I would remind you that as jurors you've taken an oath, that you all have a duty to consult with one another and deliberate with a view to reaching an agreement if it can be done without violence to individual judgment. Each of you must decide the case for yourself, but only after an impartial consideration of the evidence with your fellow jurors. In the course of deliberations, each of you should not hesitate to reexamine your own views and change your opinion if it is erroneous, but none of you should surrender your honest conviction as to the weight or the effect of the evidence solely because of the opinion of your fellow jurors for the mere purpose of returning a verdict.

The jury returned to deliberations, and the court called the jury back into the courtroom forty-five minutes later to release it for the evening.

The next morning, the court informed counsel that it had received a note from a juror asking to be replaced. In the note, the juror expressed that "while the mitigating factors do not offset the aggravating factors in one of the murders, I cannot with any peace of mind vote for the death penalty . . . . I feel unqualified to continue as a juror . . . ." The trial judge discussed with counsel the content of the note and his planned instructions in general terms, stating in part, "I received a written communication from one of the members of the jury through the sheriff this morning. . . . [T]he juror is indicating they're [sic] having some difficulty following the law and has asked that I place an alternate in."

Defense counsel requested that the court charge the jury pursuant to *State v. Smith*, 320 N.C. 404, 358 S.E.2d 329 (1987), regarding the jury's question on the previous day. The trial court refused to give defendant's requested jury instruction, denied defendant's motion for a mistrial, and instructed the jury regarding the juror's letter as follows:

Folks, I've had a communication from one of your members indicating that they're [sic] having some difficulty in the matter, and it's asked that they [sic] be replaced. The law doesn't allow me to do that. Once the jury deliberations begin in the sentencing phase in this type of case, I'm not allowed to remove someone . . . . I must let the twelve jurors that begin the deliberations conclude the matter.

Now, yesterday[,] one of the questions that I received was an inquiry as to what would happen in a certain numerical division. I will tell you that your inability to reach a unanimous verdict should not be your concern, but should simply be reported to the Court.

The jury returned a verdict of death less than one hour later.

Defendant contends that the trial court violated defendant's federal and state constitutional rights to presence and the effective assistance of counsel by refusing to disclose the full content of the notes, failing to let counsel see or read the notes, misrepresenting the content, and responding without eliciting and considering the informed positions of defendant and his counsel. We disagree.

In a capital case, a defendant must be present at every stage of the trial. N.C. Const. art. I, § 23; *State v. Locklear*, 349 N.C. 118, 135, 505 S.E.2d 277, 286 (1998), *cert. denied*, 526 U.S. 1075, 143 L. Ed. 2d 559 (1999). "When an ex parte communication relates to some aspect of the trial, the trial judge generally should disclose the communication to counsel for all parties." *Rushen v. Spain*, 464 U.S. 114, 119, 78 L. Ed. 2d 267, 273 (1983). Upon receiving a message from a juror, the trial court should give counsel an opportunity to be heard and then answer the message in open court. *See Rogers v. United States*, 422 U.S. 35, 39, 45 L. Ed. 2d 1, 6 (1975).

In the case at hand, defendant was present when the proceeding in question took place. Furthermore, while the trial court did not read the notes verbatim to counsel, the court promptly and adequately summarized the jury's question and the note from the juror. The trial court informed counsel that the jury had a question about "what happens if there's a division on the fourth issue" and later informed defendant and counsel that there was a numerical division indicated in the note. Similarly, the trial court informed counsel that it had received a communication from a juror "indicating they're [sic] having some difficulty following the law and has asked that I place an alternate in." The trial court heard from counsel and responded in open court to each of the communications. As such, we find no violation of defendant's right to presence.

[2] Defendant also claims that his attorneys were deprived of their ability to make informed decisions about appropriate responses to the notes. Defendant contends that counsel, had they known the full

and true content of the notes, would have taken greater and more effective steps to protect defendant's rights.

"A defendant's right to counsel includes the right to the effective assistance of counsel." *State v. Braswell*, 312 N.C. 553, 561, 324 S.E.2d 241, 247 (1985). Defendant bears the burden of showing that his counsel's performance was deficient and that the defendant was prejudiced by the deficient performance. *Id.* at 561-62, 324 S.E.2d at 248.

In the present case, it is clear from the record that counsel understood that the jury wanted to know what should happen if the jurors were unable to unanimously agree about Issue Four. Trial counsel immediately requested an instruction advising the jury of "the results of what happens if they're not able to agree." We do not agree that the failure to disclose the jury's precise numerical division precluded counsel from the full opportunity to defend defendant. The fair and accurate disclosure of the content of the note was sufficient to render counsel the full opportunity to effectively represent defendant. Likewise, the trial judge informed counsel of the substantive content of the juror's letter and stated, "I'm going to tell them that I can't replace a juror." As such, defense counsel had the opportunity to object to the proposed instruction. We conclude that the trial court's refusal to disclose the exact content of the communications did not deprive defendant of his constitutional right to effective assistance of counsel.

[3] Defendant also contends that the trial court's conduct violated N.C.G.S. § 15A-1234(a)(1) and the Code of Judicial Conduct. We disagree.

N.C.G.S. § 15A-1234(a)(1) provides in pertinent part: "After the jury retires for deliberation, the judge may give appropriate additional instructions to . . . [r]espond to an inquiry of the jury made in open court . . . ." N.C.G.S. § 15A-1234(a)(1) (1999). Defendant failed to object to the procedure by which the inquiry was communicated to the trial judge and has thus waived this argument. N.C. R. App. P. 10(b)(1). In any event, we are not convinced that the statute precludes the trial court from receiving a written communication from the jury and responding to such in open court.

Defendant further argues that the trial court's actions violated Canon 3A(4) of the Code of Judicial Conduct, which in pertinent part provides: "A judge should accord to every person who is legally

interested in a proceeding, or his lawyer, full right to be heard according to law, and, except as authorized by law, neither initiate nor consider *ex parte* or other communications concerning a pending or impending proceeding." Code of Judicial Conduct Canon 3A(4), 2000 Ann. R. N.C. 276. Having already determined that the trial court's actions were authorized by law, we find no merit in defendant's argument.

**[4]** In his second argument, defendant contends that the trial court erroneously admitted evidence of defendant's bad character during the State's case-in-chief. Defendant argues that the admitted evidence was irrelevant and inadmissible and that it violated his constitutional right to a fundamentally fair capital sentencing proceeding.

The rules of evidence do not apply in sentencing proceedings, N.C.G.S. § 8C-1, Rule 1101(b)(3) (1999), although they may be used as a guideline to reliability and relevance, *State v. Greene*, 351 N.C. 562, 568, 528 S.E.2d 575, 579, *cert. denied*, —— U.S. ——, 148 L. Ed. 2d 543, 2000 WL 1629376 (Dec. 4, 2000) (No. 00-6684). This Court has said that in a capital sentencing proceeding, "the prosecution must be permitted to present *any* competent, relevant evidence relating to the defendant's character or record which will substantially support the imposition of the death penalty so as to avoid an arbitrary or erratic imposition of the death penalty." *State v. Brown*, 315 N.C. 40, 61, 337 S.E.2d 808, 824 (1985), *cert. denied*, 476 U.S. 1164, 90 L. Ed. 2d 733 (1986), *overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988).

We hold that the trial court did not err in allowing the admission of testimony regarding defendant's temperament, a fight defendant had with his girlfriend at work, an alleged statement by defendant that he smoked marijuana, and a high school homework assignment that showed defendant's knowledge of drugs, as the testimony was competent, relevant evidence of defendant's character and did not violate his right to a fundamentally fair capital sentencing proceeding.

**[5]** In his third argument, defendant contends that the trial court erred by admitting a child's hearsay statement into evidence.

Officer Connie Searcy testified that Officer Michele Daugherty told her that Damion, a foster child in the victim's home, told Officer Daugherty that the person who shot the victims "pointed a gun at me, the man did. . . . Looked like a monster. He might kill somebody else."

STATE v. DAVIS

[353 N.C. 1 (2000)]

The State cross-examined three other witnesses regarding whether defendant pointed a gun at the foster child. Defendant contends that this evidence and questioning violated settled rules of evidence as well as the United States and North Carolina Constitutions and that the violation constituted plain error.

A defendant waives any possible objection to testimony by failing to object to this testimony when it is first admitted. *See State v. Hunt,* 325 N.C. 187, 196, 381 S.E.2d 453, 459 (1989) (reference to the defendant's home as "Fort Apache" was not error when no objection was made to an earlier identical reference).

In the present case, defendant failed to object when the State questioned Officer Searcy regarding the gun-pointing incident. By failing to object to this testimony when it was first admitted, defendant waived any possible objection to its admission. Moreover, defendant failed to make an objection at trial on constitutional grounds. This failure to preserve the issue resulted in waiver. N.C. R. App. P. 10(b)(1); *State v. Jaynes,* 342 N.C. 249, 263, 464 S.E.2d 448, 457 (1995), *cert. denied,* 518 U.S. 1024, 135 L. Ed. 2d 1080 (1996).

Because defendant failed to object to the admission of this evidence, we review this issue for plain error. *State v. Carter,* 338 N.C. 569, 593, 451 S.E.2d 157, 170 (1994), *cert. denied,* 515 U.S. 1107, 132 L. Ed. 2d 263 (1995). Plain error is " 'fundamental error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done.' " *State v. Odom,* 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983) (quoting *United States v. McCaskill,* 676 F.2d 995, 1002 (4th Cir.) (footnote omitted), *cert. denied,* 459 U.S. 1018, 74 L. Ed. 2d 513 (1982)). We find no such error in the admission of this evidence.

[6] In his fourth argument, defendant contends that the trial court erred by admitting evidence of Miller's good character during the State's case-in-chief, thereby violating the rules of evidence as well as the United States and North Carolina Constitutions. Specifically, defendant argues that the evidence was irrelevant and inflammatory. We disagree.

Evidence is relevant where it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (1999). This Court has held that evidence that the victim was a good person, or "fleshing out the

STATE v. DAVIS

[353 N.C. 1 (2000)]

humanity of the victim," is permissible "so long as it does not go too far." *State v. Reeves*, 337 N.C. 700, 723, 448 S.E.2d 802, 812 (1994), *cert. denied*, 514 U.S. 1114, 131 L. Ed. 2d 860 (1995); *see also Payne v. Tennessee*, 501 U.S. 808, 825, 115 L. Ed. 2d 720, 735 (1991) (victim-impact evidence may be admitted during a capital sentencing proceeding unless it "is so unduly prejudicial that it renders the trial fundamentally unfair").

In the instant case, the trial court denied defendant's pretrial motion to prohibit the State from "introducing or arguing victim impact evidence" and admitted evidence regarding Miller's good character during the State's case-in-chief. Specifically, the State presented evidence that Miller had prepared meals for defendant and other relatives, attended defendant's athletic events, and generally treated defendant well. The State also presented evidence that Miller appeared to have a close relationship with Caroline. The trial court admitted a photograph of Miller when she was alive and several photographs of her landscaped yard.

We note that the State submitted and the jury found as an aggravating circumstance that the murder was especially heinous, atrocious, or cruel. Evidence that defendant had murdered a blood relative who had opened her home to him and offered him a stable environment tended to support this aggravating circumstance. The State's evidence further showed that the killing of Miller was especially heinous, atrocious, or cruel partially because she had been especially caring, patient, and loving to defendant.

After a careful review of the record, we conclude that the evidence was both relevant and admissible and did not go "too far" within the meaning set out in *Reeves*.

Defendant also challenges the admission of the evidence on constitutional grounds. However, defendant failed to make an objection at trial on constitutional grounds. This failure to preserve the issue results in waiver. N.C. R. App. P. 10(b)(1); *Jaynes*, 342 N.C. at 263, 464 S.E.2d at 457.

[7] In his fifth argument, defendant contends that the trial court erroneously allowed the prosecutors to cross-examine defense witnesses regarding defendant's bad character. We disagree.

A trial court "has broad discretion over the scope of cross examination." *State v. Call*, 349 N.C. 382, 411, 508 S.E.2d 496, 514 (1998). The prosecution may offer evidence of a pertinent trait of a

defendant's character to rebut evidence of a pertinent trait of character when first offered by the defendant. *See Carter*, 338 N.C. at 598, 451 S.E.2d at 173.

In the present case, defendant introduced evidence on cross-examination that he was a good worker. Subsequently, defendant's first witness, his mother, was questioned about or testified on direct-examination as to the following: defendant worked at Food Lion and Bi-Lo, played football and basketball, had taken the SAT to try to get into college, had been admitted to college, took a test to gain admission into the Air Force, and had a girlfriend he took to the prom. Subsequent defense witnesses testified that defendant was polite, had a good attitude, was an overachiever, and behaved appropriately in school.

On cross-examination, the State elicited evidence from defendant's mother and other defense witnesses that defendant sold and used illegal drugs, had parties in hotel rooms, pushed his grandfather down, slapped his girlfriend, had been charged with and convicted of drug offenses, and violated jail rules.

We conclude that the trial court did not abuse its discretion in permitting this cross-examination that was offered in rebuttal of defendant's evidence of good character.

[8] In his sixth argument, defendant contends that the trial court erred by allowing the State to cross-examine a witness about defendant's conduct in Spanish class. Defendant argues that admission of this evidence violated settled evidence rules as well as the United States and North Carolina Constitutions. We disagree.

The rules of evidence do not apply to a sentencing hearing, N.C.G.S. § 8C-1, Rule 1101(b)(3), yet hearsay statements introduced therein must be relevant and bear indicia of reliability, *State v. Stephens*, 347 N.C. 352, 363, 493 S.E.2d 435, 442 (1997), *cert. denied*, 525 U.S. 831, 142 L. Ed. 2d 66 (1998).

In the present case, defendant filed a motion *in limine* to exclude evidence about an incident in his Spanish class, but the trial court deferred ruling on this motion.

On direct examination, Stephen Chandler, defendant's history teacher and football coach in 1995, testified for the defense that defendant never had a behavioral problem, always participated in class, came to practice on time, and was never a discipline problem.

STATE v. DAVIS

[353 N.C. 1 (2000)]

On cross-examination, when the prosecutor asked Chandler about an incident in Spanish class, the trial court held a *voir dire*. Over objection, Chandler testified that another math teacher had told him that he heard defendant "had gotten in trouble" and had engaged in "aggressive" behavior towards his Spanish teacher. Defendant contends that these statements were double-hearsay since Chandler had no personal knowledge of the incident.

We conclude that the trial court did not abuse its discretion in permitting the cross-examination by the State that served to rebut defendant's evidence that defendant was not a behavior problem in school. Further, since defendant did not object to the admission of the statements on constitutional grounds, we review this issue for plain error. *See State v. Lemons*, 352 N.C. 87, 530 S.E.2d 542 (2000). After reviewing the record, we find no error so fundamental that justice could not have been done.

[9] In his seventh argument, defendant contends that the trial court erred by admitting evidence on cross-examination of the food defendant ate in jail, including numerous candy bars, soft drinks, and snacks.

We note that defendant did not object when the State first asked about the subject matter and that defendant did not move to strike any of the answers. This Court has held that "when, as here, evidence is admitted over objection, but the same or similar evidence has been previously admitted or is later admitted without objection, the benefit of the objection is lost." *Hunt*, 325 N.C. at 196, 381 S.E.2d at 459. Defendant failed to object to earlier questions and answers related to the food he consumed while in jail; therefore, our review is limited to plain error. Although we strain to see the relevance of what defendant ate while in jail, we conclude that admission of the evidence did not constitute plain error.

[10] In his eighth argument, defendant contends that the trial court committed plain error by admitting evidence related to his future dangerousness, in violation of settled evidence rules and defendant's state and federal constitutional rights. We disagree.

Evidence of future dangerousness is not improper in a sentencing proceeding. *State v. Williams*, 350 N.C. 1, 28, 510 S.E.2d 626, 644, *cert. denied*, 528 U.S. 880, 145 L. Ed. 2d 162 (1999). The prosecutor may "urge the jury to recommend death out of concern for the future dangerousness of the defendant." *Id.*

**STATE v. DAVIS**

[353 N.C. 1 (2000)]

In the instant case, the State elicited testimony from defense witness Dr. Noble that defendant could be dangerous in the future under certain conditions. The State also elicited testimony that prison inmates make and use homemade knives and that many prison employees are unarmed.

We conclude that the trial court did not err in admitting evidence of defendant's future dangerousness. We note that defendant failed to object to Dr. Noble's testimony that defendant could "clearly be dangerous under certain conditions" in the future. Even assuming *arguendo* that it was error to admit such evidence, we do not conclude that "absent the error, the jury probably would have reached a different result." *State v. Jordan*, 333 N.C. 431, 440, 426 S.E.2d 692, 697 (1993). Thus, the admission of the evidence relating to defendant's future dangerousness did not rise to the level of plain error. This assignment of error is rejected.

[11] In his ninth argument, defendant contends that the trial court violated evidence rules and defendant's state and federal constitutional rights by allowing the State to cross-examine witnesses about good character traits of victim Miller. We disagree.

"The trial court exercises broad discretion over the scope of cross-examination . . . ." *Locklear*, 349 N.C. at 156, 505 S.E.2d at 299. Evidence that the victim is a good person is permissible so long as it does not go "too far." *Reeves*, 337 N.C. at 723, 448 S.E.2d at 812.

In the instant case, defendant claims that the evidence elicited by the State went too far and was unduly prejudicial. The State elicited testimony on cross-examination that Miller was a "fine woman," gave defendant "a beautiful home," attended his athletic events, provided him with clothing and food, and cared for foster children.

Defendant failed to object to the above evidence of Miller's good character. In any event, we hold that the evidence of Miller's good character elicited by the State on cross-examination did not go too far for purposes of *Reeves*, nor did it violate defendant's constitutional right to a fundamentally fair sentencing hearing.

[12] In his tenth argument, defendant contends that the trial court erroneously admitted "victim impact" evidence and allowed the prosecutor to present such evidence throughout the capital sentencing proceeding. We disagree.

The Eighth Amendment to the United States Constitution does not bar a prosecutor from arguing "victim impact" evidence at the

sentencing phase of a capital trial. *Payne*, 501 U.S. at 825, 115 L. Ed. 2d at 735. The State should not be barred from demonstrating the loss to society and to the victim's family which resulted from the homicide. *Id.* However, the Fourteenth Amendment to the United States Constitution may provide a defendant relief where the "victim impact" evidence is "so unduly prejudicial that it renders the trial fundamentally unfair." *Id.* Finally, in discussing the admissibility of character evidence of the victim, this Court has held that "the State should be given some latitude in fleshing out the humanity of the victim so long as it does not go too far." *Reeves*, 337 N.C. at 723, 448 S.E.2d at 812.

In the present case, defendant filed a motion *in limine* to prohibit the State from "introducing or arguing victim impact evidence," including evidence of the survivors' "grief and trauma" at "any phase of" the sentencing hearing. The trial court denied the motion.

During jury selection and the sentencing proceeding, the prosecutor, over objection, introduced certain courtroom spectators as good friends or family members of Miller. Furthermore, Bobby Fortune, a witness for the State, testified that he "loved" Miller; "went together" with Miller for twenty-five years before, between, and after her marriages; and helped Miller landscape her backyard. The State elicited the following testimony from Fortune during direct-examination:

Q. Mr. Fortune, tell the jury how Joyce Miller's death has impacted you.

[DEFENSE COUNSEL]: Objection.

COURT: Overruled.

A. Joyce Miller's death affected me where I can't think at times. The job I do, I need to think . . . and at times she gets on my mind so bad that I can't even work, or won't work. I just sit around the house mostly moping or staring or just daydreaming. It helps a lot sometimes if I got friends . . . but after they're gone and I'm there by myself, that's when it hurts the most. She is constantly staying on my mind night and day. I get up with her on my mind and go to bed with her on my mind.

We conclude that the evidence admitted regarding Fortune's close relationship with the victim did not go too far and was not "so unduly prejudicial that it render[ed] the trial fundamentally unfair."

*Payne*, 501 U.S. at 825, 115 L. Ed. 2d at 735. The limited "victim impact" evidence that was introduced at the capital sentencing proceeding was proper pursuant to *Payne* and *Reeves*. This assignment of error is rejected.

**[13]** In his eleventh argument, defendant contends that the trial court erred in allowing the prosecutors to ask impertinent and badgering questions. Defendant argues that the trial court violated the rules of evidence as well as the United States and North Carolina Constitutions, and committed plain error. We disagree.

Many of the questions and answers that defendant challenges either were admitted without objection or, if objected to and sustained, were not followed by a motion to strike. Defendant's failure to object or, in the alternative, move to strike following a sustained objection limits our review to plain error. *State v. Barton*, 335 N.C. 696, 709, 441 S.E.2d 295, 302 (1994). We find no plain error.

The remaining questions that defendant challenges were objected to and properly overruled because defendant had previously injected the evidence into the proceeding or allowed it to be admitted as evidence earlier with no objection. *See Hunt*, 325 N.C. at 196, 381 S.E.2d at 459. This assignment of error is without merit.

**[14]** In his twelfth argument, defendant contends that the trial court erred by excluding letters and cards that defendant wrote to his mother since his arrest while he was incarcerated. Defendant contends that the exclusion of the letters violated settled evidence rules as well as the United States and North Carolina Constitutions. We disagree.

Defendant relies on *State v. Jones*, 339 N.C. 114, 154, 451 S.E.2d 826, 847 (1994), *cert. denied*, 515 U.S. 1169, 132 L. Ed. 2d 873 (1995), in which this Court stated:

When evidence is relevant to a critical issue in the penalty phase of a capital trial, it must be admitted, evidentiary rules to the contrary under state law notwithstanding. *Green v. Georgia*, 442 U.S. 95, 60 L. Ed. 2d 738 (1979). The jury cannot be precluded from considering mitigating evidence relating to the defendant's character or record and the circumstances of the offense that the defendant offers as the basis for a sentence less than death.

In *Jones*, this Court held that the trial court erred by excluding the testimony of a witness who was prepared to say that the defendant

had communicated remorse for what he had done. However, this Court ultimately found that the exclusion of the evidence was harmless beyond a reasonable doubt because another witness had been allowed to read to the jury a letter the defendant had written in which the defendant expressed regret. Notably, while the rules of evidence do not apply in a sentencing proceeding, the trial judge still must determine the admissibility of evidence subject to general rules excluding evidence that is repetitive or unreliable. *State v. Simpson,* 341 N.C. 316, 350, 462 S.E.2d 191, 211 (1995), *cert. denied,* 516 U.S. 1161, 134 L. Ed. 2d 194 (1996).

In the present case, defense counsel requested that defendant's mother be allowed to read the letters to the jury and proffered the exhibits as evidence tending to show defendant's remorse and relationship with his mother. The State objected. Defendant's mother was allowed to testify that she received the letters from defendant; that they were personal in nature; and that, in them, defendant expressed remorse for what he had done. The trial court ruled that the letters were inadmissible on grounds that they were cumulative of evidence already before the jury: "I'm going to find that the admission of the letters themselves to prove remorse or his relationship with his mother would be cumulative, that there's already been evidence produced for the jury to consider on those issues, and I'm going to exclude those letters."

When the trial court made its ruling, defendant had already presented evidence that he loved his mother. Moreover, several witnesses had testified that defendant constantly cried and expressed remorse about what he had done when they visited him during his incarceration. There was even evidence in the record that defendant frequently cried during the capital sentencing proceeding.

We conclude that the letters would have offered substantially the same evidence as the testimony of defendant's mother and other witnesses. Defendant was allowed to present to the jury evidence of remorse and of a loving relationship with his mother. In any event, the letters were unreliable in that they were written by a defendant facing a capital sentencing proceeding to a likely witness in the proceeding. As such, we hold that the trial court properly excluded the letters as cumulative and unreliable. Assuming *arguendo* that the trial court erred in excluding the letters from evidence, such error was harmless beyond a reasonable doubt. N.C.G.S. § 15A-1443(b) (1999); *Jones,* 339 N.C. at 154, 451 S.E.2d at 848. This argument is without merit.

STATE v. DAVIS

[353 N.C. 1 (2000)]

**[15]** In his thirteenth argument, defendant contends that the trial court erred in excluding the testimony of Colin Wilmont that defendant would make a positive impact on society in prison, thereby violating the rules of evidence and the United States and North Carolina Constitutions. We disagree.

The admissibility of mitigating evidence during the sentencing phase is not constrained by the rules of evidence. N.C.G.S. § 8C-1, Rule 1101(b)(3). However, the trial judge must determine the admissibility of such evidence subject to general rules excluding evidence that is repetitive or unreliable, or lacks an adequate foundation. *Simpson*, 341 N.C. at 350, 462 S.E.2d at 211; *see also State v. Strickland*, 346 N.C. 443, 462, 488 S.E.2d 194, 205 (1997) (the trial court did not err in excluding testimony during a capital sentencing proceeding because of the "undependable nature of the evidence, its limited mitigating value, and its potential to distract the jury"), *cert. denied*, 522 U.S. 1078, 139 L. Ed. 2d 757 (1998).

In the instant case, defendant proffered Wilmont, defendant's seventeen-year-old friend, to testify that defendant would have a positive impact by talking to and counseling young people who visited prison. Defendant contends that the evidence was relevant to mitigating circumstances including age and to the catchall, and to serve as a basis for a sentence less than death. Defendant also contends that this evidence was sufficient rebuttal to the State's evidence that defendant would not be useful to society in prison and would be a danger to unarmed civilians in prison.

We conclude, however, that this testimony by defendant's friend tending to suggest that defendant would have had a positive impact on young people visiting prison was purely speculative. As such, the trial court did not commit prejudicial error or abuse its discretion by excluding this evidence.

Assuming *arguendo* that the court's ruling was erroneous, the record shows that the trial court admitted evidence that defendant was "like a . . . leader" to Wilmont and had a positive impact on people on and off the football field. Thus, the jury had an opportunity to consider the positive influence defendant had on others for purposes of the catchall mitigating circumstance. As such, any error was harmless beyond a reasonable doubt. *See* N.C.G.S. § 15A-1443(b).

In his fourteenth argument, defendant assigns error to closing arguments made by the prosecution. Defendant argues that the

State's improper arguments violated rules of evidence as well as defendant's constitutional rights, and that the trial court's failure to intervene *ex mero motu* amounted to plain error.

**[16]** First, defendant contends that the prosecutor made improper biblical arguments. As a general rule, prosecutors have wide latitude in the scope of their argument "to argue the law, the facts, and reasonable inferences supported thereby." *State v. Frye*, 341 N.C. 470, 498, 461 S.E.2d 664, 678 (1995), *cert. denied*, 517 U.S. 1123, 134 L. Ed. 2d 526 (1996). Furthermore, this Court " 'has found biblical arguments to fall within permissible margins more often than not.' " *State v. Walls*, 342 N.C. 1, 61, 463 S.E.2d 738, 770 (1995) (quoting *State v. Artis*, 325 N.C. 278, 331, 384 S.E.2d 470, 500 (1989), *sentence vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990)), *cert. denied*, 517 U.S. 1197, 134 L. Ed. 2d 794 (1996). While this Court has disapproved of arguments that the Bible does not prohibit the death penalty, it has held that such arguments are not so improper as to require intervention *ex mero motu* by the trial court. *Williams*, 350 N.C. at 27, 510 S.E.2d at 643. "We caution all counsel that they should base their jury arguments solely upon the secular law and the facts." *Id.*

We have reviewed the prosecutor's argument in its entirety. A portion of the prosecutor's argument is as follows:

Now, I'm going to close with some brief remarks from or about the Bible, and I'm going to be brief about that because I don't wish to offend . . . jurors . . . and because our Supreme Court doesn't want us to make biblical arguments. And we asked all of you if you could follow the laws of this case and the laws of man. I make any remarks in anticipation of these issues because we've had witnesses about this. In the Book of Matthew[,] we're told about when the Herodians . . . came to test Jesus about the powers of the government . . . . And he said, "Then render unto Caesar what is Caesar's, and unto God what is God's." And for the purposes of this trial, [defendant] is Caesar's and these are Caesar's laws. . . . [A]nd there's the story about the adulteress brought before Jesus by the crowd, and they were planning to stone her. And Jesus didn't say, "Don't stone her." He told them, "He who is without sin cast the first stone." And that, ladies and gentlemen, is the difference between justice and vengeance. . . . The jury swore an oath and you all promised that you wouldn't be biased, that you would hear the evidence, that you'd decide in accord-

ance with the law, and sitting as a body under those circumstances with those promises you are sinless and you may cast that stone, and cast it you must.

"Vengeance is mine," sayeth the Lord. "I will repay." God may wreak vengeance on [defendant] or God may have mercy on his soul after you do justice. It is not our prerogative to forgive [defendant] under these laws. God may have mercy on his soul or vengeance on his soul, because God can do what man cannot, and man cannot punish these crimes as they were, and man cannot protect any of his potential future victims.

Defendant objected at this point in the prosecutor's argument, but stated no grounds for his objection. The trial court sustained the objection as to the statement "future victims." Nothing in the record indicates that defendant specifically objected to the prosecutor's biblical references in his closing argument.

In the absence of objection, our " 'standard of review to determine whether the trial court should have intervened *ex mero motu* is whether the allegedly improper argument was so prejudicial and grossly improper as to interfere with defendant's right to a fair trial.' " *Walls*, 342 N.C. at 48, 463 S.E.2d at 763 (quoting *State v. Alford*, 339 N.C. 562, 571, 453 S.E.2d 512, 516 (1995)).

We disapprove of counsel's biblical references, especially in light of counsel's admission that this Court does not condone such arguments. However, we note that here, as in *Williams*, the prosecutor counseled the jurors that they should base their sentencing decision upon the secular law. Even if error, we do not conclude that the prosecutor's arguments were so improper as to require intervention by the trial court *ex mero motu*.

[17] Second, defendant contends that the prosecutor misstated the law. The prosecutor stated to the jury:

The Supreme Court says, in *State vs. Jones* that prosecutorial argument encouraging the jury to lend an ear to the community is not proper. However, encouraging the jury to act as the voice and conscience of the community is proper and is one of the very reasons for the establishment of the jury system. So regardless of all the people who would come before you and ask you to listen to the community about the defendant's life, that is not what the law says.

[DEFENSE COUNSEL]: Objection.

[PROSECUTOR]: The law says—

COURT: Overruled.

[PROSECUTOR]: —you are the voice and the conscience of the community.

[DEFENSE COUNSEL]: Objection.

COURT: Overruled.

Defendant contends that this argument was an unconstitutional misstatement of capital sentencing law and that it communicated to the jury that, under North Carolina law as interpreted by this Court, the jury was not required to listen to, consider, or give effect to defendant's witnesses' sworn evidence about defendant's life. We disagree.

The State must not ask the jurors to " 'lend an ear to the community rather than a voice.' " *State v. Scott*, 314 N.C. 309, 312, 333 S.E.2d 296, 298 (1985) (quoting *Prado v. Texas*, 626 S.W.2d 775, 776 (Tex. Crim. App. 1982)). Yet, it is not improper for the State to "remind the jurors that 'they are the voice and conscience of the community.' " *State v. McNeil*, 350 N.C. 657, 687-88, 518 S.E.2d 486, 505 (1999) (quoting *State v. Brown*, 320 N.C. 179, 204, 358 S.E.2d 1, 18, *cert. denied*, 484 U.S. 970, 98 L. Ed. 2d 406 (1987)), *cert. denied*, 529 U.S. 1024, 146 L. Ed. 2d 321 (2000).

In the instant case, the prosecutor correctly stated that the jurors must not lend an ear to the community and that the jurors may act as the voice and conscience of the community. We are not convinced by defendant's contention that the prosecution instructed the jury to disregard the testimony of defense witnesses when it stated: "So regardless of all the people who would come before you and ask you to listen to the community about the defendant's life, that is not what the law says." Admittedly, this statement is unclear in light of the fact that no witness asked the jury to listen to the community. However, any confusion generated by the statement was cured when the trial court instructed the jury that "it would be your duty to consider as a mitigating circumstance any aspect of the defendant's character or record or any of the circumstances of this murder that the defendant contends is a basis for a sentence less than death, and any

other mitigating circumstance arising from this evidence which you deem to have mitigating value." We find no prejudicial error in the prosecutor's argument.

[18] Third, defendant contends that the prosecutor traveled outside the evidentiary record and made arguments not supported by any evidence. Defendant did not object to this portion of the argument. When a defendant fails to object to the prosecutor's comments during closing arguments, "only an extreme impropriety on the part of the prosecutor will compel this Court to hold that the trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument that defense counsel apparently did not believe was prejudicial when originally spoken." *State v. Richardson*, 342 N.C. 772, 786, 467 S.E.2d 685, 693, *cert. denied*, 519 U.S. 890, 136 L. Ed. 2d 160 (1996). We have reviewed the prosecutor's argument, and we do not find it to be so grossly improper as to require intervention by the trial court *ex mero motu*.

[19] Fourth, and finally, defendant contends that the prosecutor violated his constitutional rights by commenting on defendant's silence. The following exchange occurred during the State's closing arguments:

> [PROSECUTOR]: Now, [defendant] sits here like this, and I know that it's hard for you to picture him doing what you know he did and what he's plead [sic] "guilty" to doing, and it's especially hard because he grows his hair out and then he tips his head down.
>
> [DEFENSE COUNSEL]: Objection.
>
> COURT: Overruled.
>
> [PROSECUTOR]: And then he looks up and he looks pitiful and you can look at him. This is a huge, momentous decision you're going to make, and you shouldn't have to sneak a glance to see whether he's bawling or rolling his eyes or saying "did not" while a witness is testifying . . . .

Defendant contends that this argument was an indirect comment on defendant's decision not to testify at the hearing. Defendant argues that, by pointing out defendant's conduct in the courtroom, including sitting at the counsel table, bowing his head, crying, rolling his eyes, and muttering, the prosecutor called attention to what defendant did not do, namely, testify.

"[A]ny direct reference to defendant's failure to testify is error and requires curative measures be taken by the trial court." *State v. Reid*, 334 N.C. 551, 554, 434 S.E.2d 193, 196 (1993). Furthermore, the constitutional right of the accused to remain silent is violated by language that is "of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *State v. Rouse*, 339 N.C. 59, 95-96, 451 S.E.2d 543, 563 (1994) (quoting *United States v. Anderson*, 481 F.2d 685, 701 (4th Cir. 1973), *aff'd*, 417 U.S. 211, 41 L. Ed. 2d 20 (1974)), *cert. denied*, 516 U.S. 832, 133 L. Ed. 2d 60 (1995).

Defendant's reliance on *State v. McLamb*, 235 N.C. 251, 257, 69 S.E.2d 537, 541 (1952), as support for his contention is misplaced. In *McLamb*, while the defendant did not testify, his wife and several men testified on his behalf. The prosecutor commented that the defendant was "hiding behind his wife's coat tail," an obvious reference to the defendant's failure to testify. *Id.* In contrast, in the instant case, the prosecutor's comments about defendant's mannerisms in the courtroom did not constitute references to defendant's constitutional right to remain silent. This argument is rejected.

[20] In defendant's fifteenth argument, he challenges the trial court's jury instructions regarding the N.C.G.S. § 15A-2000(e)(5) aggravating circumstance. Defendant contends the trial court's instruction was erroneous as it failed to submit the essential timing element to the jury. We agree.

An aggravating circumstance that may be considered in a capital sentencing proceeding is that "[t]he capital felony was committed while the defendant was engaged . . . in the commission of . . . robbery." N.C.G.S. § 15A-2000(e)(5) (1999). This subsection "guides the jury's deliberation upon criminal conduct of the defendant which takes place 'while' or during the same transaction as the one in which the capital felony occurs." *State v. Goodman*, 298 N.C. 1, 24, 257 S.E.2d 569, 584 (1979).

In the instant case, during the charge conference, the State requested that the court use its proffered (e)(5) jury instruction instead of the pattern instruction. Defense counsel objected and asked the trial court to administer the pattern (e)(5) jury instruction. However, the trial court overruled the objection and used the State's requested (e)(5) instruction.

During the jury charge for the murder of Miller, the trial court gave the State's requested instructions as follows:

[F]our aggravating circumstances . . . may be applicable to the case of Joyce Miller: First, "Was this murder committed by the defendant while the defendant was engaged in the commission of armed robbery?" . . . It is sufficient to support this aggravating circumstance that the defendant committed this murder while engaged in the commission of an armed robbery even if the armed robbery was committed after Joyce Miller was killed, so long as the armed robbery occurred during a continuous series of events surrounding Joyce Miller's death.

Now, I charge that for you to find that the defendant committed this murder while engaged in the commission of the armed robbery, the State must prove seven things beyond a reasonable doubt. First, that the defendant took property from the person of Joyce Miller or in her presence. Second, that the defendant carried away the property. Third, that Joyce Miller did not voluntarily consent to the taking and carrying away of the property. Fourth, that the defendant knew that he was not entitled to the property. Fifth, that at the time of the taking the defendant intended to deprive Joyce Miller of its use permanently. Sixth, that the defendant had a firearm or other dangerous weapon in his possession at the time he obtained the property. . . . And seventh, that the defendant obtained the property by endangering or threatening the life of Joyce Miller with the firearm or other dangerous weapon.

During deliberations, the jury requested that the trial court reinstruct it on armed robbery. The trial court repeated the State's requested (e)(5) instruction in full. Defendant again objected. The jury subsequently found the (e)(5) circumstance to exist.

Defendant contends that the essence of the (e)(5) circumstance is that it provides for greater punishment when a capital felony is committed *while* a defendant is engaged in the commission of other dangerous felonies. Defendant further argues that the trial court failed to instruct the jury on this essential timing element.

In describing the State's burden, the trial court enumerated seven things the State was required to prove beyond a reasonable doubt in order to show that defendant committed the murder while engaged in the commission of armed robbery. The seven things comprised the elements of armed robbery and did not require a finding that the murder was committed *while* engaged in the commission of the armed robbery. The consequence of the trial court's instruction is that the

State was able to prove (e)(5) without proving that the murder occurred *while defendant was engaged in armed robbery*. N.C.G.S. § 15A-2000(e)(5).

Following the charge, the trial court compounded its error by stating, "So, I charge that if you find, from the evidence and beyond a reasonable doubt, that on or about May 24th, 1996 [the seven elements of armed robbery were satisfied] . . . you would find this aggravating circumstance and so indicate by writing 'yes' in the space after the aggravating circumstance . . . ."

We note that the pattern jury instruction on (e)(5) provides as follows:

> If you find from the evidence beyond a reasonable doubt that *when the defendant killed the victim* the defendant was . . . (set out the findings necessary for the felony . . .) you would find this aggravating circumstance[.]

N.C.P.I.—Crim. 150.10(5A) (1997) (emphasis added). The pattern jury instruction includes a timing element in that it requires the jury to "find from the evidence beyond a reasonable doubt that when the defendant killed the victim (the elements necessary to commit the felony)" were fulfilled. *Id.* In the instant case, the trial court's charge to the jury lacked the requisite timing element.

We conclude that the trial court failed to charge the jury with sufficient clarity that the State had the burden to show that the criminal conduct took place *while* or during the same transaction as the murder. Thus, the trial court erred in giving the instruction to the jury. We next address whether this error warrants a new capital sentencing proceeding.

A review of the record discloses that defendant indicated to the investigating officer that he killed Miller around 7:00 p.m. Defendant also indicated that he placed the stolen materials, including the VCR, into the Bravada truck and drove to the mall at approximately 7:15 p.m. For purposes of this aggravating circumstance, the jury was instructed to consider the taking of the keys to the Bravada, the Bravada itself, and one of the VCRs. The span of time between Miller's murder and the alleged armed robbery was at most thirty minutes. Thus, all of the evidence presented during the sentencing proceeding tended to show that the murder and alleged armed robbery were part of a continuous series of events.

Furthermore, the trial court properly instructed the jury that it could find this aggravating circumstance if it determined that the armed robbery occurred during a continuous series of events surrounding Miller's death. Finally, on the issues and recommendation form, this issue was stated as follows: "Was this murder committed by the Defendant while the Defendant was engaged in the commission of Armed Robbery?" Therefore, when the jurors marked "yes" on the form, they found that the murder was committed *while defendant was engaged in the commission of armed robbery.* Thus, the instructions and issues and recommendation form, when considered in light of the evidence in this case, communicated to the jury that the murder had to occur while defendant was engaged in the commission of armed robbery.

In light of the foregoing, we conclude that there is no reasonable likelihood that the jury applied the challenged instruction in a manner that violated the Constitution. *See State v. Jennings,* 333 N.C. 579, 621, 430 S.E.2d 188, 209, *cert. denied,* 510 U.S. 1028, 126 L. Ed. 2d 602 (1993). Assuming *arguendo* that the error was of constitutional magnitude, such error was harmless beyond a reasonable doubt. *See* N.C.G.S. § 15A-1443(b).

Defendant makes a similar argument about the identical instructions the trial court gave regarding Caroline's murder. However, we need not address this argument since the jury recommended life imprisonment without parole for Caroline's death. This argument is rejected.

[21] In his sixteenth argument, defendant challenges the trial court's instructions on aggravating circumstance (e)(6), that the murder was committed for pecuniary gain. Defendant contends that the instructions given by the trial court allowed the jury to find the (e)(6) circumstance without making the necessary finding about defendant's motive in that the instructions did not require the jury to find that defendant murdered for the purpose of pecuniary gain. Defendant contends that the instructions were erroneous in law and violated his rights under the United States and North Carolina Constitutions. We disagree.

An aggravating circumstance that may be considered in capital sentencing is that "[t]he capital felony was committed for pecuniary gain." N.C.G.S. § 15A-2000(e)(6). "This aggravating circumstance considers defendant's motive and is appropriate where the impetus for the murder was the expectation of pecuniary gain." *State v.*

*Moore*, 335 N.C. 567, 610, 440 S.E.2d 797, 822, *cert. denied*, 513 U.S. 898, 130 L. Ed. 2d 174 (1994). However, the jury may find this aggravating circumstance even where financial gain was not the defendant's primary motivation. *Id.*

In the instant case, during the charge conference, the trial court accepted the State's requested instruction on the (e)(6) aggravating circumstance, over defendant's objection. The instruction was given as follows:

> [T]he second aggravating circumstance that you may consider . . . is: "Was this murder committed for pecuniary gain?" A murder is committed for pecuniary gain if the defendant, when he commits it, has obtained or intends to obtain money or other things that can be valued in money as a result of the death of the victim. In order to find that this murder was committed for pecuniary gain, you do not have to find that the primary motive of the defendant was financial gain. If you find, from the evidence beyond a reasonable doubt, that when the defendant killed the victim, that the defendant took personal property or other items belonging to Joyce Miller and that he intended or expected to obtain money or property or any other thing that can be valued in money, you would find this aggravating circumstance and would so indicate by having your foreperson write "yes" in the space . . . .

The jury subsequently found the (e)(6) circumstance to exist.

We conclude that the trial court properly instructed the jury that it must find that defendant murdered for the purpose of pecuniary gain in order to find the (e)(6) aggravating circumstance. Notably, the trial court began its instructions by setting out the issue for the jury: "Was this murder committed for pecuniary gain?" The trial court subsequently instructed the jury to find this circumstance if it found that, when defendant committed the murder, he had obtained or intended or expected to obtain money. More specifically, the trial court charged the jury that it must determine whether, "when defendant took the personal property belonging to Joyce Miller, he intended or expected to obtain money or property or any other thing . . . valued in money." On the recommendation form, the issue was stated, "Was this murder committed for pecuniary gain?"

We note that the instruction given by the trial court was remarkably similar to the pattern instruction. *See* N.C.P.I.—Crim. 150.10(6).

While defendant argues that the trial court erred in charging the jury that "[i]n order to find that this murder was committed for pecuniary gain, you do not have to find that the primary motive of the defendant was financial gain," we conclude that the instruction was correct as a matter of law. *See Moore*, 335 N.C. at 610, 440 S.E.2d at 822. Furthermore, by instructing the jury that it need not find that defendant's *"primary* motive" was financial gain, the trial court implicitly communicated that financial gain must have been a motive. This case is distinguishable from *State v. Bishop*, 343 N.C. 518, 472 S.E.2d 842 (1996), *cert. denied*, 519 U.S. 1097, 136 L. Ed. 2d 723 (1997), in which the challenged instruction contained no language concerning the intent or motive of the defendant.

Having determined that the trial court's pecuniary gain instruction was not erroneous, we need not address defendant's argument that the instruction was unconstitutional.

[22] In his seventeenth argument, defendant contends that the trial court erred in instructing the jury on the mitigating circumstance found in N.C.G.S. § 15A-2000(f)(1). Defendant argues that the trial court's instruction violated his constitutional rights by peremptorily charging the jury that defendant had a history of prior criminal activity.

N.C.G.S. § 15A-2000(f)(1) provides that a mitigating circumstance in capital sentencing may be that "[t]he defendant has no significant history of prior criminal activity."

In the present case, the State introduced contested evidence of defendant's alleged prior criminal activity. The trial court instructed the jury regarding the (f)(1) mitigating circumstance as follows:

First, consider whether the "defendant has no significant history of prior criminal activity" prior to the date of the murder. . . . You would find this mitigating circumstance if you find that the assault, drug offenses, use of illegal drugs and gambling or any other acts were not a significant history of prior criminal activity. . . . If none of you find this circumstance to exist, you would so indicate by having your foreperson write "no" [on the issues and recommendation form].

The jury did not find the (f)(1) circumstance to exist.

Defendant contends that the trial court's instruction improperly assumed that the State's evidence regarding alleged criminal conduct

by defendant was true. Therefore, according to defendant, the trial court deprived the jury of the opportunity to determine whether the essential elements of the alleged crimes had been met and whether such alleged criminal conduct constituted a significant history of prior criminal activity. Defendant cites the proposition that "the trial court in charging a jury may not give an instruction which assumes as true the existence or nonexistence of any material fact in issue." *State v. Cuthrell*, 235 N.C. 173, 174, 69 S.E.2d 233, 234 (1952).

Defendant failed to object to the instruction at trial, thereby failing to preserve this argument for appeal. N.C. R. App. P. 10(b)(2). Moreover, defendant failed to "distinctly" contend in his assignment of error that the alleged error constituted plain error. *Id.* Nonetheless, we have examined defendant's argument, and we find no plain error.

"In order to rise to the level of plain error, the error in the trial court's instructions must be so fundamental that (i) absent the error, the jury would have reached a different verdict; or (ii) the error would constitute a miscarriage of justice if not corrected." *State v. White*, 340 N.C. 264, 299, 457 S.E.2d 841, 862, *cert. denied*, 516 U.S. 994, 133 L. Ed. 2d 436 (1995).

Assuming *arguendo* that the trial court's instructions assumed that defendant engaged in the prior criminal activity, overwhelming evidence was presented that defendant engaged in the criminal activity listed. Several witnesses testified regarding defendant's assault of his girlfriend. Defendant's witness, Dr. Noble, testified regarding defendant's drug abuse and drug dealing, and defendant's witness, Orren Daugherty, testified that defendant won money by gambling.

The trial court did not assume the jury's duty to determine whether defendant's history was significant. Rather, the trial court listed defendant's prior criminal activity, which was supported by the evidence, and asked that the jury determine the significance of this activity.

Admittedly, the pattern jury instructions require the jury to determine whether a defendant has engaged in any prior criminal conduct as well as the significance of any such conduct: "[Y]ou would find this mitigating circumstance if you find that (describe all defendant's prior criminal activity) and that this is not a significant history of prior criminal activity." N.C.P.I.—Crim. 150.10(1); *see also State v. Daniels*, 337 N.C. 243, 271, 446 S.E.2d 298, 316 (1994) (the trial court

properly instructed: "You would find this mitigating circumstance if you find that the defendant's prior criminal history is the conviction of driving while impaired, communicating threats, and simple assault, and that this was not a significant history of prior criminal activity"), *cert. denied*, 513 U.S. 1135, 130 L. Ed. 2d 895 (1995). However, we find no plain error in the instruction because the evidence of defendant's drug activity, assault, and gambling was overwhelming, and the jury was permitted to determine the significance of said conduct. This assignment of error is rejected.

[23] In his eighteenth argument, defendant contends that the trial court erred in refusing to give peremptory instructions about the existence of four mitigating circumstances. Defendant contends that he was entitled to peremptory instructions on the nonstatutory mitigating circumstance "[t]hat the Defendant never had any permanent or even long-term relationship with an appropriate male role model" and on three statutory mitigating circumstances: (f)(1), "[t]he Defendant has no significant history of prior criminal activity"; (f)(2), "[t]he murder was committed while the Defendant was under the influence of mental or emotional disturbance"; and (f)(6), "[t]he capacity of the Defendant to appreciate the criminality of his conduct or to conform his conduct to requirements of law was impaired." We disagree.

"A defendant is entitled to a peremptory instruction when a mitigating circumstance is supported by uncontroverted evidence." *State v. White*, 349 N.C. 535, 568, 508 S.E.2d 253, 274 (1998), *cert. denied*, 527 U.S. 1026, 144 L. Ed. 2d 779 (1999). " 'Conversely, a defendant is not entitled to a peremptory instruction when the evidence supporting a mitigating circumstance is controverted.' " *Id.* (quoting *State v. Womble*, 343 N.C. 667, 683, 473 S.E.2d 291, 300 (1996), *cert. denied*, 519 U.S. 1095, 136 L. Ed. 2d 719 (1997)).

Defendant contends that the evidence was uncontroverted that he had no appropriate male role model in his life. However, there was evidence that defendant spent substantial time in the custody of his grandparents. Furthermore, there were male teachers and male coaches who testified on defendant's behalf and indicated extensive interactions with defendant during his life.

Defendant also contends that the evidence was uncontroverted that he had no significant history of prior criminal activity. However, the State presented evidence tending to show that defendant used and sold drugs, assaulted his girlfriend, gambled, and stole money.

Defendant further contends that the evidence was uncontroverted that the murders were committed while he was under the influence of mental or emotional disturbance and that his capacity was impaired. Defendant's expert, Dr. Noble, testified that defendant was under the influence of a mental or emotional disturbance when he killed Caroline and Miller. Dr. Noble further testified that when defendant killed Caroline, his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was "diminished, but he did not completely lose his sense of right and wrong" and that at the time he killed Miller, defendant's capacity was "impaired." The State introduced evidence of different possible interpretations of the results of the MMPI, an assessment tool used by Dr. Noble. The computer software that scored the MMPI generated possible interpretations that defendant was manipulative, aggressive, rebellious of authority figures, resentful, uncompromising, and hedonistic, and that defendant might be physically threatening toward women to whom he was close when he felt frustrated. The State also presented evidence that defendant performed well in school, wrote well-organized homework assignments, and had been accepted at North Carolina A&T State University. Finally, the State's evidence showed that following the murders, defendant disposed of evidence, went shopping, went to a party, and danced. Therefore, this evidence was controverted as well.

We find no error in the trial court's refusal to give peremptory instructions. This argument is rejected.

[24] In his nineteenth argument, defendant argues that the trial court committed constitutional error in refusing to instruct the jury that "life imprisonment without parole" was the punishment alternative to death and instructing instead that the alternative was merely "life imprisonment." Defendant concedes that the trial court informed the jury on some occasions that the punishment alternative was "life imprisonment without parole" but argues that the phrase was used infrequently and sporadically. Defendant argues that every time the trial court referred to the alternative to death, he should have instructed the jury that it was "life imprisonment without parole."

N.C.G.S. § 15A-2002 provides in pertinent part: "The judge shall instruct the jury, in words substantially equivalent to those of this section, that a sentence of life imprisonment means a sentence of life without parole." We hold that the judge in this case did instruct the jury that a sentence of life imprisonment means a sentence of life

without parole. In the charge to the jury, the judge instructed the jury, "If you unanimously recommend a sentence of life imprisonment, the court will impose a sentence of life imprisonment without parole." We find nothing in the statute that requires the judge to state "life imprisonment without parole" every time he alludes to or mentions the alternative sentence. We find no error in the trial court's actions. This argument is without merit.

[25] In his twentieth argument, defendant contends that the trial court erred in referring to the prosecutor as "our" and/or "your" district attorney. Defendant claims that the trial court's statements violated its duty of impartiality and constituted an improper expression of opinion in violation of N.C.G.S. § 15A-1222 as well as the United States and North Carolina Constitutions. We disagree.

N.C.G.S. § 15A-1222 provides that "[t]he judge may not express during any stage of the trial any opinion in the presence of the jury on any question of fact to be decided by the jury." "In evaluating whether a judge's comments cross into the realm of impermissible opinion, a totality of the circumstances test is utilized." *State v. Larrimore*, 340 N.C. 119, 155, 456 S.E.2d 789, 808 (1995). Further, since defendant claims that he was deprived of a fair trial by the judge's statements, he "has the burden of showing prejudice in order to receive a new trial." *State v. Gell*, 351 N.C. 192, 207, 524 S.E.2d 332, 342, *cert. denied*, —— U.S. ——, 148 L. Ed. 2d 110 (Oct. 20, 2000) (No. 99-10222). "Whether the accused was deprived of a fair trial by the challenged remarks must be determined by what [was] said and its probable effect upon the jury in light of all attendant circumstances." *State v. Burke*, 342 N.C. 113, 122-23, 463 S.E.2d 212, 218 (1995).

In the instant case, during jury selection, the trial court asked prospective jurors whether they had any contact with "our" district attorney's office and whether they knew that the State was represented by "your" and "our" district attorney; and stated that this case would be prosecuted by "your" elected district attorney; and that the burden to prove death was on the State through "your" district attorney. Defendant failed to object to any of these statements.

We decline to hold that these comments by the trial judge constituted an improper expression of opinion. We first note that the opinion must be on a "question of fact to be decided by the jury." N.C.G.S. § 15A-1222 (1999). Whether the district attorney is "our" or "your" district attorney is not a question of fact to be decided by the jury. After a full examination of the trial transcript, we conclude that, when

viewed in the totality of circumstances, defendant has failed to show prejudice. This argument is without merit.

**[26]** In his twenty-first argument, defendant contends that the trial court erred in submitting both aggravating circumstances (e)(5) and (e)(6) to the jury. Defendant argues that the trial court's submission of both the (e)(5) and (e)(6) aggravating circumstances in this case constituted unconstitutional double-counting. We disagree.

" 'Double-counting' occurs when two aggravating circumstances based upon the same evidence are submitted to the jury." *Call*, 349 N.C. at 426, 508 S.E.2d at 523. In *State v. East*, 345 N.C. 535, 481 S.E.2d 652, *cert. denied*, 522 U.S. 918, 139 L. Ed. 2d 236 (1997), this Court stated:

> It is established law in North Carolina that it is error to submit two aggravating circumstances when the evidence to support each is precisely the same. *State v. Gibbs*, 335 N.C. 1, 58-59, 436 S.E.2d 321, 354 (1993), *cert. denied*, [512] U.S. [1246], 129 L. Ed. 2d 881 (1994); *State v. Jennings*, 333 N.C. 579, 627-28, 430 S.E.2d 188, 213-14, *cert. denied*, 510 U.S. 1028, 126 L. Ed. 2d 602 (1993). Conversely, where the aggravating circumstances are supported by separate evidence, it is not error to submit both to the jury, even though the evidence supporting each may overlap. *State v. Gay*, 334 N.C. 467, 495, 434 S.E.2d 840, 856 (1993); *State v. Jones*, 327 N.C. 439, 452, 396 S.E.2d 309, 316 (1990).

*East*, 345 N.C. at 553-54, 481 S.E.2d at 664. "[S]ome overlap in the evidence supporting each aggravating circumstance is permissible so long as there is not a complete overlap of evidence." *Call*, 349 N.C. at 426, 508 S.E.2d at 523.

As to the (e)(5) circumstance, whether the murder was committed while defendant was engaged in the commission of armed robbery, the trial court instructed the jury to consider only:

> [the] taking of the keys to the Bravada automobile, the taking of the Bravada automobile and the VCR which was in the family room . . . in considering this aggravating factor. You may not consider the taking of the credit card, Miss Joyce Miller's purse or the checks of Miss Joyce Miller in order for the State to prove this aggravating factor. Those items may be considered on another aggravating factor which I'll explain to you later, but you may not consider the taking of the credit card, the checks

or the purse of Miss Joyce Miller when you consider this aggravating circumstance.

As to the (e)(6) pecuniary gain circumstance, the trial judge then instructed the jury to consider only "the taking of the credit card, checks and the purse of Miss Miller." He further clarified that "[y]ou may not consider the taking of the VCR, the automobile—that is the Bravada—or the keys to the Bravada automobile when you consider this aggravating factor. Those items may only be considered for purposes of the armed robbery."

It is clear from the record that the trial court did not allow the jury to find both aggravating circumstances using the same evidence. Both circumstances were supported by sufficient, independent evidence. The trial court properly instructed the jury that it could not use the same evidence as the basis for finding both the (e)(5) and (e)(6) circumstances. This argument is rejected.

**[27]** In his twenty-second argument, defendant challenges the prosecutor's statements to the jurors during jury selection regarding the State's burden of proof. Defendant contends that he is entitled to a new capital sentencing proceeding because the prosecutor repeatedly told jurors during jury selection that the State's burden of proof was "beyond a reasonable doubt to the satisfaction of the jury." Defendant argues that the prosecutor misstated the standard, causing the jurors to believe that the burden of proof was essentially "satisfaction of the jury." Defendant further argues that the misstatement confused the jury, constituted plain error, and violated defendant's constitutional right to a fundamentally fair sentencing hearing.

Defendant failed to object to the prosecutor's statements. Defendant's failure to raise this issue in the trial court constitutes waiver. N.C. R. App. P. 10(b)(2). " 'This Court has applied the plain error analysis only to instructions to the jury and evidentiary matters.' " *McNeil*, 350 N.C. at 674, 518 S.E.2d at 497 (quoting *State v. Atkins*, 349 N.C. 62, 81, 505 S.E.2d 97, 109 (1998), *cert. denied*, 526 U.S. 1147, 143 L. Ed. 2d 1036 (1999)). Here, defendant assigns error to statements by the prosecutor during jury selection to which he failed to object. Therefore, defendant has waived appellate review of this issue. This argument is rejected.

**[28]** In his twenty-third argument, defendant contends that the trial court unconstitutionally chilled his right to testify.

The trial court addressed defendant as follows:

COURT: Mr. Davis, I just want to make an inquiry on the record. Have you had an opportunity to discuss with your lawyers about testifying in this matter?

DEFENDANT: Yes, sir.

COURT: You understand you have the right to testify, and if you do testify, that you'll be subject to being cross-examined on a variety of subject matters limited only by my discretion of what's relevant. Do you understand that?

DEFENDANT: Yes, sir.

COURT: As long as you've had that explained to you by your lawyers and you've been advised about your right, that's all I need to make an inquiry about.

Defendant argues that the trial court's instructions were erroneous in that they did not give more specific details about the rules that guide cross-examination.

We hold that the trial court properly instructed defendant since the trial court "did not attempt to give defendant detailed instructions concerning the scope of cross-examination and did not give an instruction inconsistent with any of the Rules of Evidence." *State v. Davis*, 349 N.C. 1, 31, 506 S.E.2d 455, 471 (1998), *cert. denied*, 526 U.S. 1161, 144 L. Ed. 2d 219 (1999). Furthermore, the exchange above indicates that defendant had discussed the consequences of testifying with his counsel. *See Id.*

Accordingly, we conclude that the trial court's instructions were not erroneous and, therefore, did not impermissibly chill defendant's right to testify. This argument is without merit.

[29] In his twenty-fourth and twenty-fifth arguments, defendant contends that the trial court erred in denying his motion to dismiss both charges of first-degree murder on the grounds that the indictments: (1) failed to charge the elements of first-degree murder, (2) failed to allege facts to increase the maximum penalty for the crime, and (3) failed to allege capital aggravating circumstances.

Defendant recognizes that this Court has held for many years that the "short-form" murder indictment under N.C.G.S. § 15-144 is sufficient to allege first-degree murder under theories of both premeditation and deliberation and felony murder. *See State v. Leroux*, 326 N.C. 368, 378, 390 S.E.2d 314, 322, *cert. denied*, 498 U.S. 871, 112 L. Ed. 2d

155 (1990); *Brown,* 320 N.C. at 191, 358 S.E.2d at 11; *State v. Avery,* 315 N.C. 1, 14, 337 S.E.2d 786, 793 (1985). However, defendant contends that the decision in *Jones v. United States,* 526 U.S. 227, 143 L. Ed. 2d 311 (1999), brings our prior case law on short-form indictments into question. We disagree.

We addressed in full and rejected this argument in *State v. Wallace,* 351 N.C. 481, 528 S.E.2d 326, *cert. denied,* —— U.S. ——, 148 L. Ed. 2d 498, 69 U.S.L.W. 3364 (2000), and reaffirmed our position in *State v. Braxton,* 352 N.C. 158, 531 S.E.2d 428 (2000). In *Braxton,* this Court examined the validity of short-form indictments in light of *Jones,* 526 U.S. 227, 143 L. Ed. 2d 311, and *Apprendi v. New Jersey,* 530 U.S. 466, 147 L. Ed. 2d 435 (2000), and held that nothing in either case altered prior case law on these matters. *Braxton,* 352 N.C. at 175, 531 S.E.2d at 437-38. Accordingly, we conclude that the short-form indictments are constitutional. Defendant's arguments concerning the validity of his indictments are without merit and are rejected.

**[30]** In his twenty-sixth argument, defendant contends that the trial court erred in ordering defendant's mental health expert, Dr. Noble, to prepare and disclose to the State a written report of his findings and a copy of his handwritten notes of interviews with defendant. Defendant contends that the trial court's order exceeded the scope of N.C.G.S. § 15A-905(b) and violated defendant's attorney-client and Fifth Amendment privileges. We disagree.

N.C.G.S. § 15A-905 governs the procedures for court-ordered pretrial discovery in criminal cases. The statute provides, in relevant part:

> If the court grants any relief sought by the defendant under G.S. 15A-903(e), the court must, upon motion of the State, order the defendant to permit the State to inspect and copy or photograph results or reports of physical or mental examinations or of tests, measurements or experiments made in connection with the case, or copies thereof, within the possession and control of the defendant which the defendant intends to introduce in evidence at the trial or which were prepared by a witness whom the defendant intends to call at the trial, when the results or reports relate to his testimony.

N.C.G.S. § 15A-905(b) (1999). In the case at hand, defendant requested discovery from the State and was given open file access to

the State's files. Once defendant was given access to the State's files, it was logical and permissible for the trial court to order defendant's expert to prepare a written report and to produce handwritten notes for the State's perusal pursuant to N.C.G.S. § 15A-905(b). The trial court's order in this case simply provided for the reciprocal discovery requirements under N.C.G.S. § 15A-905(b) and did not exceed the scope of the discovery statute. *See Atkins*, 349 N.C. at 92-94, 505 S.E.2d at 116-17 (court order for defense expert to produce "all reports" and all of his notes did not violate N.C.G.S. § 15A-905(b)). We find no error in the trial court's order, which ensured fairness to both sides in the preparation of their case.

**[31]** Defendant further contends that the trial court's order violated defendant's attorney-client privilege and privilege against self-incrimination. Defendant argues that the order allowed the State to gain access to information that defendant supplied to his attorney's agent, Dr. Noble, during and for the purpose of the investigation and preparation of his defense. We disagree.

Defendant's communications with Dr. Noble were not protected by an attorney-client privilege. The attorney-client privilege "covers only confidential communications made by the client to his attorney." *State v. Brown*, 327 N.C. 1, 20, 394 S.E.2d 434, 446 (1990). However, "[a] communication is covered by the attorney-client privilege if it has been 'made in the course of seeking or giving legal advice for a proper purpose.' " *Jennings*, 333 N.C. at 611, 430 S.E.2d at 204 (quoting 1 Henry Brandis, Jr., *Brandis on North Carolina Evidence* § 62, 302 (3d ed. 1988)). Nothing indicates that Dr. Noble examined or communicated with defendant in the course of seeking or giving legal advice. We are aware that " '[d]isclosures made to the attorney's expert should be equally unavailable, at least until he is placed on the witness stand.' " *State v. Ballard*, 333 N.C. 515, 522, 428 S.E.2d 178, 182 (quoting *United States ex rel. Edney v. Smith*, 425 F. Supp. 1038, 1054 (E.D.N.Y. 1976), *aff'd*, 556 F.2d 556 (2d Cir.), *cert. denied*, 431 U.S. 958, 53 L. Ed. 2d 276 (1977)), *cert. denied*, 510 U.S. 984, 126 L. Ed. 2d 438 (1993). Even if Dr. Noble were the agent of defendant's attorneys, he clearly lost such privilege once he was placed on the witness stand. *Id.* Moreover, "the trial court is always at liberty to compel disclosure of privileged communications if it 'is necessary to a proper administration of justice.' " *East*, 345 N.C. at 545, 481 S.E.2d at 660 (quoting N.C.G.S. § 8-53.3 (Supp. 1996)). We find no abuse of the trial court's discretion in compelling disclosure of the communications. Likewise, defendant's argument that the order violated his

STATE v. DAVIS

[353 N.C. 1 (2000)]

Fifth Amendment privilege against self-incrimination is feckless. Thus, this assignment of error is without merit.

## II. PRESERVATION ISSUES

Defendant raises four additional arguments that he concedes have been previously decided contrary to his position, but asks this Court to reconsider those decisions: (1) the trial court committed reversible constitutional error by refusing to instruct jurors that they "must" rather than "may" consider mitigating circumstances when deciding Issues Three and Four during their jury deliberations, (2) the trial court committed reversible constitutional error by placing the burden of proof on defendant to satisfy the jury with respect to mitigating circumstances and refusing to instruct jurors that proof by a preponderance of the evidence is proof which indicates that it is more likely than not that a mitigating circumstance exists, (3) the trial court committed reversible constitutional error by erroneously instructing the jurors that they could find that a mitigating circumstance exists and simultaneously find that the mitigating circumstance has no mitigating value, and (4) the trial court committed reversible constitutional error by denying defendant's motion *in limine* to prohibit submission of the (e)(9) aggravating circumstance and subsequently instructing the jury on this factor.

After carefully considering defendant's arguments on these issues, we find no compelling reason to depart from our prior holdings. Accordingly, we reject these arguments.

## III. PROPORTIONALITY

[32] Having concluded that defendant's capital sentencing proceeding was free of prejudicial error, we turn now to duties reserved exclusively for this Court in capital cases. It is our duty under N.C.G.S. § 15A-2000(d)(2) to ascertain: (1) whether the record supports the jury's finding of the aggravating circumstances on which the sentence of death was based; (2) whether the death sentence was entered under the influence of passion, prejudice, or other arbitrary consideration; and (3) whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

In the Miller murder, the following aggravating circumstances were submitted to and found by the jury: (1) the murder was committed while defendant was engaged in the commission of armed rob-

bery, N.C.G.S. § 15A-2000(e)(5); (2) the murder was committed for pecuniary gain, N.C.G.S. § 15A-2000(e)(6); (3) the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9); and (4) the murder was part of a course of conduct in which defendant engaged and which included the commission by defendant of other crimes of violence against other persons, N.C.G.S. § 15A-2000(e)(11). After thoroughly examining the record, transcripts, and briefs in the instant case, we conclude that the record fully supports the aggravating circumstances submitted to and found by the jury. Additionally, we find no indication that the sentence of death in this case was imposed under the influence of passion, prejudice, or any other arbitrary consideration. We now turn to our final statutory duty of proportionality review.

[33] It is proper in our proportionality review to compare the present case with other cases in which this Court has concluded that the death penalty was disproportionate. *State v. McCollum*, 334 N.C. 208, 240, 433 S.E.2d 144, 162 (1993), *cert. denied*, 512 U.S. 1254, 129 L. Ed. 2d 895 (1994). We have found the death penalty disproportionate in seven cases. *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396, *cert. denied*, 522 U.S. 900, 139 L. Ed. 2d 177 (1997), *and by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373; *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983).

We conclude that this case is not substantially similar to any of the aforementioned cases where this Court has held that the death penalty was disproportionate. Some distinguishing characteristics of this case include: (1) defendant prevented the victim from calling for help by pulling the phone cord from the receptacle and hacking her to death; and (2) the jury found four aggravating circumstances, in a combination that this Court has never ruled to be disproportionate. However, it is not the number of aggravating circumstances found by one jury that controls the proportionality review. Rather, " 'we will consider the totality of the circumstances presented in each individual case and the presence or absence of a particular [aggravating circumstance] will not necessarily be controlling.' " *Stokes*, 319 N.C. at 23-24, 352 S.E.2d at 666 (quoting *Bondurant*, 309 N.C. at 694 n.1, 309 S.E.2d at 183 n.1). There is no question regarding specific intent to

kill in the instant case, as there sometimes is in felony murder cases. Here, defendant shot the victim and then made it impossible for her to call for help or leave. Moreover, Miller was shot at close range in her own home. This Court has emphasized that a murder committed in the home particularly "shocks the conscience, not only because a life was senselessly taken, but because it was taken by the surreptitious invasion of an especially private place, one in which a person has a right to feel secure." *Brown*, 320 N.C. at 231, 358 S.E.2d at 34, *quoted in State v. Adams*, 347 N.C. 48, 77, 490 S.E.2d 220, 236 (1997), *cert. denied*, 522 U.S. 1096, 139 L. Ed. 2d 878 (1998).

It is also proper to compare this case to those where the death sentence was found proportionate. *McCollum*, 334 N.C. at 244, 433 S.E.2d at 164. However, it is unnecessary to cite every case used for comparison. *Id.*; *State v. Syriani*, 333 N.C. 350, 400, 428 S.E.2d 118, 146, *cert. denied*, 510 U.S. 948, 126 L. Ed. 2d 341 (1993). Whether the death penalty is disproportionate "in a particular case ultimately rest[s] upon the 'experienced judgments' of the members of this Court." *State v. Green*, 336 N.C. 142, 198, 443 S.E.2d 14, 47, *cert. denied*, 513 U.S. 1046, 130 L. Ed. 2d 547 (1994). ·

In the instant case, defendant, after being taken into Miller's home, stole from her and then, without adequate provocation, furtively waited in her home for her to return so that he could shoot her. While she was attempting to call for help, defendant hacked her to death with a meat cleaver, in the presence of her two foster children.

After comparing this case to other roughly similar cases as to the crime and defendant, we cannot conclude as a matter of law that the death penalty for the murder of Miller was excessive or disproportionate. Accordingly, the judgment of the trial court sentencing defendant to death must be left undisturbed.

NO ERROR.