UNPUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 08-2

PHILLIP ANTWAN DAVIS,

Petitioner - Appellant,

v.

GERALD J. BRANKER, Warden, Central Prison, Raleigh, North
Carolina,

Respondent - Appellee.

Appeal from the United States District Court for the Western
District of North Carolina, at Asheville.  Frank D. Whitney,
District Judge.  (1:05-cv-00029-FDW)

Argued: October 28, 2008          Decided: January 7, 2009

Before TRAXLER and KING, Circuit Judges, and HAMILTON, Senior
Circuit Judge.

Affirmed by unpublished opinion.  Judge Traxler wrote the
opinion, in which Judge King and Senior Judge Hamilton joined.

**ARGUED:** Shelagh Rebecca Kenney, CENTER FOR DEATH PENALTY
LITIGATION, Durham, North Carolina, for Appellant.  Alana
Danielle Marquis Elder, NORTH CAROLINA DEPARTMENT OF JUSTICE,
Raleigh, North Carolina, for Appellee.  **ON BRIEF:** Thomas K.
Maher, CENTER FOR DEATH PENALTY LITIGATION, Durham, North
Carolina, for Appellant.  Roy Cooper, Attorney General of North
Carolina, Raleigh, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

TRAXLER, Circuit Judge:

Phillip Antwan Davis pleaded guilty to the capital murder of his aunt, Joyce Miller, and cousin, Caroline Miller. Following a capital sentencing hearing before a North Carolina jury, Davis was sentenced to death for the murder of Joyce and to life imprisonment for the murder of Caroline. After unsuccessfully challenging his death sentence on direct appeal and in state post-conviction proceedings, Davis filed a petition for a writ of habeas corpus in federal district court. See 28 U.S.C.A. § 2254 (West 2006). Because the North Carolina Supreme Court's decision was not contrary to, or an unreasonable application of established Supreme Court precedents, nor based on an unreasonable determination of the facts in light of the evidence presented in the state court, we affirm.

I.

In May 1996, Phillip Davis brutally murdered his aunt, Joyce Miller, and seventeen-year-old cousin, Caroline Miller, in the home they shared in Asheville, North Carolina. Two foster children, ages two and four, were present in the home when Joyce was murdered. Davis was eighteen years old and a senior in high school at the time. The circumstances of the crimes, and the events leading up to them, are described in detail in the opinion of the North Carolina Supreme Court:

2

Approximately one week before the murders, [Joyce] told her brother, Billy Davis that she was missing $800.00. Caroline believed that defendant had taken the money because he had recently purchased clothing and a gold chain. [Joyce] obtained a receipt for the clothes and returned them. Caroline was hiding the gold chain from defendant so that she and [Joyce] could take it to a pawn shop. Several days before the murders, defendant stated to Caroline, "Well, if I don't get my chain, it's only going to hurt you in the long run."

On 24 May 1996, defendant shot and killed his cousin Caroline. On the same day, he killed [Joyce] by shooting her and cutting her with a meat cleaver. [Billy] Davis visited [Joyce's] home in the evening and found [Joyce] lying in a pool of blood. Niconda Briscoe, defendant's girlfriend, arrived at approximately the same time as [Billy] and called for emergency assistance.

A paramedic with the Buncombe County Emergency Medical Service arrived at the Miller residence at 7:32 p.m. He noted blood smeared on the outside of the door. He discovered severed fingers on the floor in the foyer and [Joyce's] body in a large pool of blood. The two foster children were in the living room looking into the foyer. As the paramedic entered the living room to escort the children out, he observed Caroline in her bedroom on the bed. After checking her pulse, he determined that she, too, was dead.

Meanwhile, between 7:30 and 8:00 p.m., defendant attempted to cash a check in the amount of $360.00, bearing the name of [Joyce's] former husband, at the Bi Lo grocery store on Hendersonville Road. The manager refused to cash it, as she did not believe it was legitimate. According to the manager, defendant appeared to be "really calm."

At approximately 8:00 p.m., defendant went to Dillard's in the Asheville Mall and tried on clothing in the men's department. The sales receipt showed that defendant purchased six clothing items at 8:08 p.m. for $231.61 using a credit card in [Joyce's] name. When questioned by the cashier, defendant told her that the credit card belonged to his aunt and that

3

she knew he was using it. Two of the items defendant purchased were identical to the ones [Joyce] had returned several days prior to the murders.

At 8:21 p.m., a driver for the Blue Bird Cab Company was dispatched to the Amoco station on Hendersonville Highway. A person matching defendant's description approached the driver and said, "It's me. I'll be with you in a couple minutes." He returned with two bags and asked the driver to take him to Pisgah View Apartments.

Defendant entered unit 29-D of Pisgah View Apartments; showed an acquaintance, Felicia Swinton, the clothes he had purchased; changed clothes; and left to attend a party in West Asheville. He spent approximately twenty minutes in Swinton's apartment and acted "normal."

Kendall Brown and Ryan Mills, friends of defendant's, heard that [Joyce] and Caroline had been murdered and went to the party to pick up defendant. During the ride back to the Miller residence, defendant asked Brown if it "was ... true about the murders" and said he "wanted to know what all had happened." When they arrived at the residence, defendant sat on the curb; started crying; and said, "Please don't let them take me."

Later that evening, Sergeant David Shroat took a statement from defendant at the Asheville Police Station. Defendant first told Sergeant Shroat that he did not know what had happened; then blamed others; and finally stated, "My life is over; I did it."

Defendant described the following series of events to the detectives. Earlier in the week, defendant found a gun in the closet and test-fired it in the back yard. At approximately 5:30 p.m. on 24 May 1996, he entered Caroline's bedroom with the gun in order to get his clothes. Caroline was lying on her bed. He went to the right side of the bed, pointed the gun at her, and fired twice. He then walked around to the other side of the bed and fired a third shot at her. After killing Caroline, defendant ate a sandwich and watched television. [Joyce] arrived at the residence at approximately 7:00 p.m. with the two foster children. When defendant heard

4

her entering, he hid behind the door. After she entered, defendant shot her in the back. He shot [Joyce] only one time because he had "[n]o more bullets." [Joyce] attempted to reach the telephone, but defendant pulled the cord from the receptacle. When she tried to leave the house, he took a meat cleaver from the kitchen and struck her with it ten or twelve times with his eyes closed as he stood on top of her in the foyer.

Immediately thereafter, defendant placed his clothes in a white plastic garbage bag along with the meat cleaver. He took two VCRs, one from Caroline's bedroom and one from [Joyce's], and put them in another plastic bag along with [Joyce's] brown purse. He also took [Joyce's] black purse. At approximately 7:15 p.m., he placed the two plastic bags on the front passenger floorboard of [Joyce's] vehicle. Defendant then drove to the Asheville Mall, where he used [Joyce's] credit cards to purchase clothing.

From the Asheville Mall, defendant drove to Oak Knoll Apartments and placed the two plastic bags in the Dumpster. He then drove to the Amoco station, where he threw the black purse and the gun into a wooded area behind the station. He told the taxi cab driver whom he had called that he would be there in a minute, returned to [Joyce's] vehicle, and retrieved the shopping bags containing the clothing he had purchased at Dillard's.

Defendant left [Joyce's] vehicle at the Amoco station and traveled in the taxi to Pisgah View Apartments, where he changed clothes. He then put the stolen credit cards and keys to [Joyce's] vehicle in a garbage can near Swinton's apartment. Defendant drove around downtown Asheville with his friend Kelby Moore and smoked marijuana.

At 10:30 p.m., defendant arrived at the party in west Asheville. Defendant danced for a while at the party before Brown and Mills took him to [the Miller] residence. Upon completing his statement, defendant went to sleep under the table in the interview room.

The autopsy of [Joyce] revealed that she had a single gunshot wound to the left side of the head, amputation of two fingers, and fifteen individual and

5

clustered injuries consistent with being inflicted by a meat cleaver. The autopsy of Caroline revealed three separate gunshot wounds, one to the head with stippling around the entrance wound indicating a close range shot; one to the chest; and one to the arm.

Investigators found that Caroline's bedroom was in disarray and that a VCR and television were missing. A large amount of cash and some jewelry were discovered in a book bag in Caroline's room. In [Joyce's] bedroom, drawers had been pulled out and items had been dumped on the bed. Investigators found an empty jewelry box, a checkbook, and a box of checks on the floor. A second VCR was missing from the entertainment center in Miller's bedroom. Miller's truck, a red Bravada, was also missing.

Police officers recovered two VCRs, jewelry, clothes, a bloody meat cleaver, and a brown purse containing [Joyce's] bank cards from a Dumpster at the Oak Knoll Apartments. Additionally, they found [Joyce's] credit cards in a trash bag near Pisgah View Apartments. [Joyce's] Bravada truck, two gloves, a black purse, and a Colt .32 revolver with five spent casings in the cylinder were discovered near the Amoco station.

State v. Davis, 539 S.E.2d 243, 251-53 (N.C. 2000).

Davis pleaded guilty to two counts of first-degree murder. At the conclusion of the capital sentencing proceeding, the jury recommended a sentence of death for the murder of Joyce, based upon the following aggravating circumstances: (1) that the murder was committed by Davis while he was engaged in the commission of armed robbery; (2) that the murder was committed for pecuniary gain; (3) that the murder was especially heinous, atrocious, or cruel; and (4) that the murder was part of a course of conduct that included the commission by Davis of other crimes of violence against other persons. At least one juror

6

found fifteen of fifty submitted mitigating circumstances, but no juror found the existence of the submitted mitigating circumstance that Davis had shown remorse for his conduct and had asked for his family's forgiveness.[1]  The jury found the mitigating circumstances insufficient to outweigh the aggravating circumstances, and recommended a sentence of death for the murder of Joyce.[2]

---

[1] The mitigating circumstances found were (1) that Davis's age was mitigating; (2) that Davis pleaded guilty with no plea agreement or promise of leniency; (3) that Davis cooperated and disclosed the location of the physical evidence associated with the crimes; (4) that Davis's mother suffered from major depression and drug addiction, so as to render her a neglectful and frequently absent parent throughout Davis's childhood and teenage years; (5) that as a consequence of his mother's drug addition, Davis never received any long-term and stable nurturance from his mother; (6) that Davis was aware of his mother's illegal activities, including larceny, shoplifting, and the purchase and sale of illegal drugs; (7) that Davis's mother did not provide proper supervision and guidance for him during his formative years; (8) that both of Davis's grandparents died within one year of each other when Davis was 16 years of age; (9) that after the death of his grandparents, no person was ever granted legal custody of Davis; (10) that Davis was on track to earn his high school diploma; (11) that Davis was accepted by North Carolina A&T University; (12) that at the end of his senior year, Davis had applied and been accepted to become a member of the United States Air Force; (13) that Davis never had any permanent or even long-term relationship with an appropriate male role model; (14) that Davis has friends and family members who still love and support him; and (15) that Davis had a borderline personality disorder.

[2] With regard to the murder of Caroline, the jury found as aggravating circumstances:  (1) that the murder was committed by Davis while engaged in the commission of armed robbery; and (2) that the murder was part of a course of conduct in which Davis engaged that included the commission by Davis of other crimes of
(Continued)

7

On appeal, the North Carolina Supreme Court affirmed the conviction and imposition of the death sentence for the murder of Joyce, and the United States Supreme Court denied certiorari. Davis initiated state post-conviction proceedings in May 2002, which were denied in December 2003, and the North Carolina Supreme Court denied certiorari.

Davis thereafter filed his § 2254 petition for federal habeas relief. The magistrate judge issued a report and recommendation that the petition be denied. The district court agreed and issued an opinion denying relief, but granted a certificate of appealability on the issue of whether the trial court erred in excluding evidence of various correspondence Davis mailed to his mother while he was awaiting trial. We granted a certificate of appealability on the issue of whether the trial court erred in submitting, as separate aggravating

---

violence against other persons. As mitigating circumstances, one or more jurors found the same fifteen circumstances found in Joyce's case and, additionally, that Davis had no significant history of prior criminal activity, that Davis had signed a waiver of his constitutional rights and that Davis had a mental age of fifteen. The jury found that the mitigating circumstances were insufficient to outweigh the aggravating circumstances, but that the aggravating circumstances were not sufficiently substantial to impose the death penalty when considered with the mitigating circumstances, and recommended a sentence of life imprisonment.

8

circumstances, that Joyce's murder was committed in the course of an armed robbery and for pecuniary gain.

## II.

We review the district court's denial of federal habeas relief on the basis of a state court record de novo. See Tucker v. Ozmint, 350 F.3d 433, 438 (4th Cir. 2003). However, because the state court adjudicated Davis's claims on the merits, we review the matter in light of the limits on federal habeas review of a state conviction that are imposed by 28 U.S.C.A. § 2254(d). When a habeas petitioner's constitutional claim has been "adjudicated on the merits in State court proceedings," we may not grant relief unless the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.A. § 2254(d).

A state court's decision is contrary to clearly established federal law under § 2254(d) where it "applies a rule that contradicts the governing law set forth" by the United States Supreme Court or "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and

9

nevertheless arrives at a result different from [that] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000). A state court's decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407. Factual determinations made by the state court "shall be presumed to be correct," and "[t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C.A. § 2254(e)(1) (West 2006).

Finally, even if constitutional error occurs, habeas relief will only be granted if the trial error "had substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (internal quotation marks omitted). However, "[i]f we are in 'grave doubt' as to the harmlessness of an error, the habeas petitioner must prevail." Fullwood v. Lee, 290 F.3d 663, 679 (4th Cir. 2002) (quoting O'Neal v. McAninch, 513 U.S. 432, 436 (1995)). Such "'[g]rave' doubt exists when, in light of the entire record, the matter is so evenly balanced that the court feels itself in 'virtual equipoise' regarding the error's harmlessness." Id. (quoting O'Neal, 513 U.S. at 435).

III.

A.

We begin with Davis's claim that his constitutional rights were violated by the state court's denial of his motion to admit, as mitigating evidence, correspondence that Davis sent to his mother, Phyllis Davis, while he was incarcerated and awaiting trial for the murders of Joyce and Caroline.[3]

1.

Davis did not testify during the sentencing proceeding, but he called a number of family members and friends, as well as Dr. Jerry Noble, the clinical psychologist who evaluated Davis for trial, to offer testimony in mitigation. The evidence included testimony about Davis's difficult childhood, his mother's drug abuse and criminal activity, her accompanying absence and neglect during Davis's childhood, and Davis's efforts and successes in overcoming this troubled childhood. There was also testimony about the difficulties Davis had experienced while living with Joyce and Caroline, and his remorse for having murdered them. The North Carolina Supreme Court summarized the mitigating evidence as follows:

---

[3] The correspondence consisted of both letters and cards with handwritten notes, all of which we refer to as "the letters."

11

Defendant's mother was a drug addict, habitual felon, and mental patient who could not care for him, and his father took no responsibility for him. Since his childhood, defendant alternated between the homes of friends and relatives because his mother was periodically incarcerated or incapacitated. Defendant was a good athlete, but his parents never attended his athletic or school events. When he was thirteen years old, defendant sustained a closed-head injury when he intervened in an argument between his mother and a drug addict, who hit defendant with a baseball bat.

In the summer of 1995, defendant moved in with [Joyce] and Caroline and obtained a job at a Food Lion grocery store. He made the school football team and stopped working in September when football season began. Teammates described defendant as a leader and a hard worker. In December of 1995, defendant began working as a bag boy at a Bi Lo grocery store where he was described as a good worker. Defendant's high school principal described him as a normal and well-behaved student. Defendant was "on track" to graduate from high school, was accepted into North Carolina A & T State University, and had passed an Air Force entrance test.

There was constant rivalry between defendant and Caroline to the extent that Caroline packed up defendant's belongings on more than one occasion. There was also tension between defendant and his aunt. On one occasion, [Joyce] pointed a pistol at defendant and said that when she gave him an order, "she expected it to be done." Witnesses described defendant as remorseful and noted that he cried whenever he discussed the murders.

A clinical psychologist, Dr. Jerry Noble, testified as an expert witness. Dr. Noble performed a postarrest valuation and determined that defendant's basic psychological, emotional, and nurturing needs had been neglected. Defendant had an IQ of only 78, but he never repeated a grade or had any special-education classes. According to Dr. Noble, defendant had four significant mental disorders on 24 May 1996: (1) borderline intellectual functioning, (2) borderline personality disorder, (3) cannabis abuse, and (4) acute stress disorder. The borderline personality disorder caused defendant to be

> emotionally unstable and impulsive and to have difficulties in interpersonal relationships. Dr. Noble described defendant as anxious, depressed, immature, and prone to unravel during periods of stress. Defendant's conduct in eating a sandwich and watching television after he killed Caroline was consistent with acute stress disorder, disassociation, and derealization. According to Dr. Noble, defendant could not fully remember, did not understand, and was genuinely bewildered about [Joyce's] death. Following the homicides, defendant exhibited suicidal thoughts, increased interest in religion, and signs of remorse.

Davis, 539 S.E.2d at 253.

Phyllis Davis was one of the witnesses called to testify on Davis's behalf, and she offered extensive testimony of her neglect of Davis during his childhood, her absence from his life, and her drug abuse and criminal history. Most recently, Phyllis testified that she was arrested in April 1996 for violating her probation, approximately one month prior to Davis's arrest for the murders of Caroline and Joyce. She was sentenced to 300 days in a North Carolina prison.

In October 1996, five months after Davis's arrest but before Phyllis was released from prison, Davis wrote the first of several letters to his mother. Some of the letters are postmarked during the time period that Phyllis was imprisoned, and others are postmarked after her release from prison in January 1997. In the letters, Davis wrote that he was sorry for what he had done and asked for forgiveness. He expressed

13

interest and concern for his mother's well-being, as well as his love for her.

Davis attempted to introduce the content of the letters, both by having his mother read them and as separate exhibits, as additional mitigating evidence "to show the relationship between Phillip Davis and his mother," J.A. 335, of his remorse for having murdered Joyce and Caroline, and to "corroborate [Phyllis's] testimony and the testimony of Dr. Noble." J.A. 833. The state objected to the letters as inadmissible, self-serving hearsay. Unlike hearsay testimony of statements made by a defendant in the presence of a testifying witness which are often admitted in capital sentencing proceedings, the state contended that the letters written by Davis were immune from any type of cross-examination and were without any indicia of reliability or trustworthiness that would counsel in favor of their admissibility.

The trial court denied Davis's request that Phyllis be allowed to read the letters into evidence and to introduce them as separate exhibits, but the court allowed Phyllis to testify about their correspondence and her relationship with her son.[4]

---

[4] The trial court initially denied the request that Phyllis be allowed to read the letters into evidence, but reserved final ruling on the admissibility of the letters until the close of the defendant's case, at which point the trial court heard
(Continued)

The trial court noted that the letters were written by Davis after the murders and to his mother, a likely witness on his behalf, and that Phyllis "was unable to see [Davis] at the time the statements were written, and . . . unable to make any observation as to his demeanor or attitude or any other conduct that he might be engaged in at the time he was writing the letter to her."  J.A. 834.

The trial court also ruled that the letters were cumulative to the testimony of several of the mitigation witnesses, including Phyllis.  Phyllis testified that Davis had written her from jail, talked to her about his feelings, and "was very sorry for what he had done to our family."  J.A. 353.  Phyllis also testified that she was able to speak with Davis by telephone during this time period.  She testified that Davis had difficulty talking about the murders and that he cried when he did speak of them.  After her release from prison, Phyllis was also able to visit Davis once a month and to talk to him on the telephone between her visits.  She testified that Davis was remorseful and that he would "get[] upset if [she] sa[id] anything about Joyce or Caroline's name."  J.A. 356.  Davis would "get real watery-eyed, which, in turn, ma[de her] cry, so

arguments and considered the matter in light of all the evidence presented.

15

[she] tr[ied] not to talk about it." J.A. 356. As noted by the trial court, Phyllis was allowed to "testif[y] without objection that [Davis] expressed his remorse to her in the same letters," and "that he had expressed remorse to her in conversations with her. She further testified that she had a loving relationship and that he said he had loved her." J.A. 834.

In addition to Phyllis, a number of additional witnesses, including family members and friends, testified about Davis's expressions of remorse after the murders. Davis's brother testified that he and Davis would cry together during his visits to the prison and that Davis had demonstrated that he was "sorry for what he's done." J.A. 746. Davis's aunt testified that Davis wrote her and "asked [her] and the rest of the family to please forgive him because that is something that he never meant to happen." J.A. 793. She also testified that Davis told her he was sorry for what he had done and that she believed he was remorseful. Davis's cousin testified that she also visited Davis and "believed [Davis] [wa]s remorseful." J.A. 804.

Davis's friend, Ryan Mills, testified that when he and Davis got to the Miller home after the murders, Davis "sat down on the curb and cried." J.A. 223. Another friend testified that Davis cried during their telephone call, "stated he wished he had not done what he had done that night," and "was very upset about it." J.A. 121. Colonel Roy Parker, a teacher at

16

Davis's high school, testified that Davis "was in tears" when they visited. J.A. 525. Parker testified that Davis "seemed to be very saddened by what he had done and everything else associated with it, as you would expect from somebody in that position." J.A. 525. Sandra Darity, whom Davis described as a second mother to him, testified that Davis wrote her that "his mother is sticking with him now when he needs her most," J.A. 702, and "that he loves her for that," J.A. 703. He also told Darity that he was praying for her and her family, asked Darity to pray for him, and told Darity that he was "still the same Phillip that used to spend the night all the time. I can't believe I did this." J.A. 703. He also told Darity that "'I made a mistake by putting myself here, but a good mother might have helped prevent it, also.'" J.A. 705. Davis's former principal, Richard Green, testified that he visited Davis two or three times and each time Davis told him that he was sorry for what he had done and "appeared to be remorseful." J.A. 829. Green testified that he "sincerely th[ought] [Davis was] remorseful over what happened to Caroline and Joyce Miller." J.A. 832. Reverend Carson Moseley also talked to Davis about the murders and testified that "[w]henever [Davis] talks about what happened, it's with tears. He's very emotional at that point, so there's not a lot of talk about it other than I

17

believe regret [is] in his heart. Very emotional whenever we've spoken about it." J.A. 810.

Finally, Dr. Noble testified that he saw "signs of remorse" in Davis, as well as mental disorders consistent with one who "feels guilt, anxiety, depression, remorse about his actions." J.A. 649. Dr. Noble testified that Davis had problems with "suicidal thinking since the homicides" and "some trouble with sleep, with nightmares, with instrusive detailed images about these deaths." J.A. 649. He saw "signs of remorse in his increased interest in religious pursuits," "a statement to police of remorseful emotions," and "indications of remorse in some of his test results." J.A. 649. Dr. Noble also read to the jury the responses given by Davis that Dr. Noble believed were indicative of remorse, as follows:

> "I want to know how I got myself into such a mess." "I regret even being born." "I feel that my life is over." "I suffer when I think or dream about what I've done." "I've failed in life." "What pains me is the thought of what I've done, and I regret doing it." "I wish I was never born."

J.A. 650.

On appeal, the North Carolina Supreme Court affirmed the trial court's exclusion of the letters from evidence because they lacked sufficient indicia of reliability and were cumulative of other evidence introduced by the defendant at trial. See Davis, 539 S.E.2d at 260 (noting that "while the

18

rules of evidence do not apply in a sentencing proceeding, the trial judge still must determine the admissibility of evidence subject to general rules excluding evidence that is repetitive or unreliable"); see also State v. Raines, 653 S.E.2d 126, 137 (N.C. 2007) ("[W]hile the Rules of Evidence only serve as guidelines in capital penalty proceedings, the trial court may properly exclude hearsay statements which lack sufficient indicia of reliability or lack a proper foundation."). The court noted, for example, that Davis had presented evidence of his relationship with his mother and that a number of family and friends had testified that Davis "constantly cried and expressed remorse about what he had done when they visited him during his incarceration." 539 S.E.2d at 261. In addition, the court noted that there was "evidence in the record that defendant frequently cried during the capital sentencing proceeding." Id. (emphasis added). The court concluded

> that the letters would have offered substantially the same evidence as the testimony of defendant's mother and other witnesses. Defendant was allowed to present to the jury evidence of remorse and of a loving relationship with his mother. In any event, the letters were unreliable in that they were written by a defendant facing a capital sentencing proceeding to a likely witness in the proceeding. As such, we hold that the trial court properly excluded the letters as cumulative and unreliable.

Id. In the alternative, the court held that, "[a]ssuming arguendo that the trial court erred in excluding the letters

19

from evidence, such error was harmless beyond a reasonable doubt." Id. (citing N.C. Gen. Stat. § 15A-1443(b); State v. Jones, 451 S.E.2d 826, 848 (N.C. 1994)).

### 2.

In these federal habeas proceedings, Davis asserts that the state court's exclusion of the letters impermissibly restricted his constitutional right to present mitigating evidence, contrary to the Supreme Court's rulings in Lockett v. Ohio, 438 U.S. 586 (1978) (plurality opinion), and its progeny. Davis also relies upon the Supreme Court's decision in Green v. Georgia, 442 U.S. 95 (1979) (per curiam), asserting that the state trial court erred in applying its evidentiary rules to exclude the letters as additional evidence of remorse. We disagree.

Under the Eighth and Fourteenth Amendments to the United States Constitution, in order to constitutionally impose a capital sentence, the sentencer may "not be precluded from considering as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Lockett, 438 U.S. at 604. In Lockett, the Supreme Court declared an Ohio death penalty statute unconstitutional because it specified only three factors that could be considered by the sentencer in mitigation of the offense. See id. at 608.

20

In Eddings v. Oklahoma, 455 U.S. 104 (1982), the Court extended Lockett to a case in which the state court refused to consider, as a matter of law, any mitigating evidence of the defendant's violent family history and abuse. See id. at 112-13. "Just as the State may not by statute preclude the sentencer from considering any mitigating factor," the Court held, "neither may the sentencer refuse to consider, as a matter of law, any relevant mitigating evidence." Id. at 113-14; accord Skipper v. South Carolina, 476 U.S. 1, 6-8 (1986) (reversing imposition of death sentence where trial judge excluded as irrelevant evidence of the defendant's good behavior in jail awaiting trial).

In Green v. Georgia, the Supreme Court held that that the Due Process Clause of the Fourteenth Amendment may require the admission of mitigating evidence even if state law rules of evidence would exclude it. There, the Court reversed the death sentence based upon the trial court's application of Georgia's hearsay rule to prohibit a witness's testimony that the defendant's accomplice in the capital murder had confessed to shooting and killing the victim after ordering the defendant to run an errand. See Green, 442 U.S. at 96-97. In doing so, the Court held that "[t]he excluded testimony was highly relevant to a critical issue in the punishment phase of the trial" and that "substantial reasons existed to assume its reliability." Id. at

21

97 (citing <u>Lockett</u>, 438 U.S. at 604-05).  In particular, the Court noted that:

> [the accomplice] made his statement spontaneously to a close friend.  The evidence corroborating the confession was ample, and indeed sufficient to procure a conviction of [the accomplice] and a capital sentence.  The statement was against interest, and there was no reason to believe that [the accomplice] had any ulterior motive in making it.  Perhaps most important, the State considered the testimony sufficiently reliable to use it against [the accomplice], and to base a sentence of death upon it.

<u>Id.</u> at 97.  In light of "these unique circumstances," the Court held, "the hearsay rule may not be applied mechanistically to defeat the ends of justice."  <u>Id.</u> (internal quotation marks omitted); <u>see</u> <u>also</u> <u>Fullwood</u>, 290 F.3d at 693 (noting that "under certain circumstances, 'the Due Process Clause of the Fourteenth Amendment <u>may</u> require the admission of mitigating evidence even if state-law rules of evidence (<u>e.g.</u>, hearsay) would exclude it'" (alteration omitted) (quoting <u>Boyd v. French</u>, 147 F.3d 319, 326 (4th Cir. 1998)).

As we have previously held, however, neither <u>Lockett</u> and its progeny nor <u>Green</u> compel the conclusion that a state court is required to present a capital jury with <u>any</u> evidence the defendant proffers as mitigating, no matter how irrelevant, unreliable, or cumulative, or that a state's normal evidentiary rules must always yield to allow the introduction of such evidence:

22

> [T]he principles developed in Lockett and Eddings do not eviscerate all state evidentiary rules with respect to mitigating evidence offered in capital sentencing proceedings. For example, the application of the hearsay rule to exclude evidence offered in mitigation of the death penalty is clearly not a per se constitutional violation. It is permissible to exclude on hearsay grounds mitigating evidence which is "only [of] cumulative probative value."

Fullwood, 290 F.3d at 693 (citations and alteration omitted) (quoting Buchanan v. Angelone, 103 F.3d 344, 348-49 (4th Cir. 1996)); see also Hutchins v. Garrison, 724 F.2d 1425, 1437 (4th Cir. (1983) ("We find no indication that Eddings and Lockett preempt all state rules of evidence. Both cases speak about types of evidence, not evidentiary rules."); cf. Lockett, 438 U.S. at 604 n.12 (noting that the opinion did not "limit[] the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense"). In Buchanan, we explicitly rejected a defendant's claim that the trial court impermissibly excluded hearsay testimony offered by his expert mental health witness for the purpose of providing additional support for the conclusion that the defendant had acted under extreme emotional stress, because the expert's "testimony provided ample evidence to explain his opinion" and "the statements would have had only cumulative probative value." 103 F.3d at 349. We also noted that the excluded testimony "lack[ed] the inherent reliability of the statement excluded in

23

Green," which had been "against the declarant's penal interest, made spontaneously to a close friend, and . . . relied [upon by the state] to convict the declarant of capital murder." Id.

In this case, the state court, having heard the testimony, observed the witnesses, and reviewed the letters, similarly ruled that the letters were cumulative to the ample other evidence of remorse. In addition, the court ruled that the letters, having been written by Davis while awaiting trial on the capital murder offenses and to his mother, a likely mitigation witness on his behalf, lacked the requisite reliability or trustworthiness to render them critical or admissible under its rules of evidence. We cannot say that the trial court's decision, as affirmed by the state appellate court, was contrary to, or an unreasonable application of the clearly established Supreme Court precedents discussed above, or that the state court's factual determination was unreasonable in light of the evidence presented to it. There was abundant testimony regarding Davis's remorse and his relationship with his mother, much of which pertained to statements Davis made directly to the testifying witnesses who were in a position to evaluate his tone of voice and, in some cases, to observe his demeanor. Davis was not precluded from offering any type or category of mitigating evidence, and the letters were only of cumulative probative value. Additionally, the content of the

24

letters, which is self-serving, does not rise to the level of the critical relevancy of the accomplice's confession in Green, nor bear upon its "inherent reliability." Buchanan, 103 F.3d at 349. Indeed, the Court in Green, in ruling that the accomplice's confession was improperly excluded there, placed decided emphasis upon the fact that the confession bore the very indicia of reliability that the state court found lacking in the letters offered in this case. See Green, 442 U.S. at 97. While we might have decided the question of reliability differently were we presented with it ab initio, we cannot say that the ruling of the state trial court was an unreasonable one.

3.

Finally, we note that the North Carolina Supreme Court held that, even assuming error, the exclusion of the letters was harmless beyond a reasonable doubt. See Davis, 539 S.E.2d at 261 (citing N.C. Gen. Stat. § 15A-1443(b) ("A violation of defendant's rights under the Constitution of the United States is prejudicial unless the appellate court finds that it was harmless beyond a reasonable doubt. The burden is upon the State to demonstrate, beyond a reasonable doubt, that the error was harmless.")). Applying the Brecht harmlessness standard applicable in federal habeas proceedings, the district court ruled that Davis had failed to show that the exclusion of the letters had a "substantial and injurious effect or influence" on

25

the outcome of Davis's sentence. <u>Brecht</u>, 507 U.S. at 637 (internal quotation marks omitted). We agree.[5]

As pointed out by the district court, the circumstances of Joyce's murder were particularly gruesome and the circumstances surrounding it, chilling. After killing Caroline, Davis ate a sandwich and watched television for an hour, lying in wait for Joyce to come home. When Davis heard Joyce approach, he hid behind the door and, as she entered her home, shot her in the back. As Joyce struggled to reach the telephone, Davis ripped the cord from the wall. Finding himself out of bullets, Davis then retrieved a meat cleaver from the kitchen and struck Joyce with it fifteen times to finish the task. And he did so in the

---

[5] In his appeal to the North Carolina Supreme Court, Davis acknowledged that he had only specifically argued that the letters were relevant "to show and explain his relationship with his mother, to show remorse, and to corroborate Phyllis'[s] and other testimony," J.A. 934 (internal quotation marks omitted), but attempted to argue a host of additional reasons why the trial court should have admitted the evidence. The appellate court obviously rejected these eleventh-hour arguments, specifically noting that "[i]n the present case, defense counsel [had] requested that [Phyllis] be allowed to read the letters to the jury and proffered the exhibits as evidence tending to show defendant's remorse and relationship with his mother," <u>Davis</u>, 539 S.E.2d at 260, and ruling "that the letters would have offered substantially the same evidence as the testimony of defendant's mother and other witnesses . . . of remorse and of a loving relationship with his mother," <u>id.</u> at 261. Davis's similar attempts to expand his claim on federal habeas are barred and, in any event, we too have concluded that the exclusion of the letters, even if error, was harmless under the <u>Brecht</u> standard.

26

presence of two young children whom Joyce had brought home with her.

As also noted by the district court, "Davis's actions in the immediate aftermath of that murder appeared anything but remorseful." J.A. 1018. His first order of business was to go shopping with Joyce's money, checks, and credit cards, and, more specifically, to return to Dillard's to repurchase the items of clothing that Joyce had just returned and which had apparently brought about, at least in part, his murderous plan. With his purchases in hand, Davis then went to a friend's home to change clothes and show off his new purchases, all the while acting calmly and normally to those he encountered. He spent the remainder of the evening cruising, smoking marijuana with friends, and dancing at a nearby party until his friends found him and returned him to the crime scene.

In contrast to this aggravating evidence, Davis's jury was presented with substantial evidence of Davis's difficult childhood, as well as his attempts to overcome this disadvantage and the assistance he received from family members in his attempts to do so. The jury also heard numerous accounts by friends, family members, and clergy, as well as the mental health professional who evaluated Davis, regarding Davis's personal expressions of remorse for having committed the murders. And, the jury was able to personally observe Davis's

27

demeanor, including his crying during the proceeding. Ultimately, the jury found as an aggravating circumstance that the murder of Joyce was "especially heinous, atrocious and cruel," an aggravating circumstance not submitted for Caroline's murder, and imposed the death sentence for Joyce's murder.

Given the strength of the aggravating evidence presented in Joyce's case, compared to the relative weakness of the admitted and excluded evidence of Davis's relationship with his mother and of his remorse for the murder of his aunt, we agree with the district court's determination that Davis failed to demonstrate that the exclusion of the letters had a substantial and injurious effect or influence on the outcome of the sentencing proceeding. Therefore, even if we assume that the trial court's exclusion of the letters violated Davis's constitutional right to introduce mitigating evidence, he is not entitled to federal habeas relief as a result of the error.

B.

Davis's second argument arises from the trial court's decision to submit, as separate aggravating circumstances, that the murder of Joyce was committed while Davis was engaged in the commission of armed robbery, see N.C. Gen. Stat. § 15A-2000(e)(5), and that the murder was committed by Davis for pecuniary gain, see N.C. Gen. Stat. § 15A-2000(e)(6).

28

After murdering Caroline and Joyce, Davis stole two VCRs, the keys to Joyce's car, Joyce's purses containing bank cards and credit cards, and personal checks, and fled the scene with the stolen items in Joyce's vehicle. Within an hour, he attempted to cash a $360 check at a grocery store and purchased six items of clothing at a department store using Joyce's credit card. Some of those items of clothing were identical to those that Joyce had returned under the apparent belief that Davis had purchased them with money he had stolen from her. Davis then drove to Oak Knoll Apartments, where he discarded the VCRs in a dumpster, and to an Amoco gas station, where he abandoned the car and discarded his aunt's black purse.

Under North Carolina law, "it is error to submit two aggravating circumstances when the evidence to support each is precisely the same," but "where the aggravating circumstances are supported by separate evidence, it is not error to submit both to the jury, even though the evidence supporting each may overlap." State v. East, 481 S.E.2d 652, 664 (N.C. 1997). Based upon the evidence submitted in Davis's case, the trial court found that submission of both the armed robbery and the pecuniary gain aggravating circumstances was appropriate because each was supported by separate evidence. To further channel the jury's consideration of these aggravating circumstances, the court instructed the jury that the evidence regarding the

29

checks, money, and credit cards could be considered for purposes of the pecuniary gain circumstance, whereas the evidence regarding the keys, vehicle, and VCRs could be considered for purposes of the armed robbery circumstance. The trial court rejected Davis's contention that this amounted to the impermissible submission of double or duplicative aggravating circumstances and, thereby, skewed the process in favor of death. The Supreme Court of North Carolina affirmed, concluding that the two distinct aggravating circumstances presented were based upon sufficient, independent evidence and did not violate Davis's constitutional rights. See Davis, 539 S.E.2d at 270.

In these proceedings, Davis does not claim that the evidence was insufficient to support the separate aggravating circumstances. Rather, Davis asserts that the state court arbitrarily divided the evidence so as to support the two separate aggravating circumstances and that this division did not represent different aspects of Davis's character or the circumstances of the crimes he committed that evening. Contending that the aggravating circumstances are duplicative, Davis argues that their joint submission was the equivalent to submitting an invalid aggravating circumstance that unconstitutionally skews the weighing process in favor of death. See Stringer v. Black, 503 U.S. 222, 232 (1992) ("[W]hen the sentencing body is told to weigh an invalid factor in its

30

decision, a reviewing court may not assume it would have made no difference if the thumb had been removed from death's side of the scale.  When the weighing process itself has been skewed, only constitutional harmless-error analysis or reweighing at the trial or appellate level suffices to guarantee that the defendant received an individualized sentence.").

In Jones v. United States, 527 U.S. 373 (1999) (plurality opinion), however, the Supreme Court declined the opportunity to equate duplicative aggravating factors to invalid aggravating factors.  There, the defendant argued that two nonstatutory aggravating factors found by the jury were duplicative, vague and overbroad, in violation of the Eighth Amendment. Specifically, the jury had unanimously found (1) victim impact evidence (i.e., the victim's personal characteristics and the effect of the instant offense on her family); and (2) victim vulnerability evidence (i.e., the victim's young age, her slight stature, her background, and her unfamiliarity with San Angelo, Texas).  Because personal characteristics necessarily included those things included in the victim vulnerability charge, the defendant argued that charging both impermissibly skewed the process in favor of a death sentence.  In rejecting the challenge, a plurality of the Court noted that:

> We have never before held that aggravating factors
> could be duplicative so as to render them
> constitutionally invalid, nor have we passed on the

"double counting" theory that the Tenth Circuit advanced in [United States v.] McCullah[, 76 F.3d 1087 (10th Cir. 1996)] and the Fifth Circuit appears to have followed here. What we have said is that the weighing process may be impermissibly skewed if the sentencing jury considers an invalid factor. See Stringer v. Black, 503 U.S. 222, 232 (1992). Petitioner's argument (and the reasoning of the Fifth and Tenth Circuits) would have us reach a quite different proposition – that if two aggravating factors are "duplicative," then the weighing process necessarily is skewed, and the factors are therefore invalid.

Id. at 398 (emphasis added) (footnote omitted). However, the plurality declined to answer the question of whether duplicative factors, as opposed to an invalid factor, necessarily skew the process in favor of death. Rather, it ruled that "the factors as a whole were not duplicative – at best, certain evidence was relevant to two different aggravating factors" and that "any risk that the weighing process would be skewed was eliminated by the District Court's instruction that the jury should not simply count the number of aggravating and mitigating factors and reach a decision based on which number is greater but rather should consider the weight and value of each factor." Id. at 399-400 (internal quotation marks and alteration omitted).

Here, the trial court relied upon North Carolina law, which allows the submission of aggravating circumstances that are supported by separate evidence, see East, 481 S.E.2d at 664, and submitted both aggravating circumstances to the jury with the appropriate explanation. In addition, the trial court

32

specifically instructed the jury not to merely add up the number of aggravating circumstances against the number of mitigating circumstances:

> You should not merely add up the number of aggravating circumstances and mitigating circumstances. Rather, you must decide from all the evidence what weight to give to each circumstance and then weigh the aggravating circumstances so valued against the mitigating circumstances so valued, and finally determine whether the mitigating circumstances are insufficient to outweigh the aggravating circumstances.

J.A. 884-85.

Given the Supreme Court's opinion in Jones, we cannot say that the state trial court's decision to submit both the pecuniary gain circumstance and the armed robbery circumstance was contrary to or an unreasonable application of Supreme Court precedent.[6] In addition, we do not view the aggravating circumstances as duplicative. Although in some cases the evidence may only be susceptible of the conclusion that an armed robbery was attempted or effectuated for pecuniary gain,

---

[6] Davis's reliance upon our decision in United States v. Tipton, 90 F.3d 861 (4th Cir. 1996), and its reliance upon the Tenth Circuit's decision in McCullah are misplaced. Our decision in Tipton predates the Supreme Court's decision in Jones and, in any event, we do not evaluate whether the state court's determination is contrary to or an unreasonable application of our precedent in federal death penalty cases. See Bustos v. White, 521 F.3d 321, 325 (4th Cir. 2008). Rather, we review the ruling to determine whether the decision is contrary to or an unreasonable application of Supreme Court precedent. See id.; 28 U.S.C.A. § 2254(d).

pecuniary gain is not an element of the offense of robbery and armed robbery is not necessarily synonymous with a goal of achieving pecuniary gain. Indeed, there are a number of scenarios in which material items may be taken in the course of an armed robbery and murder for reasons wholly unrelated to the desire for pecuniary gain, such as to escape, avoid detection, or implicate another person in a murder. In this case, the evidence was clearly susceptible to the conclusion that there were, in fact, two independent aggravating circumstances: Davis took the car and VCRs (which were quickly abandoned) not for pecuniary gain, but rather to make the murders appear to be related to a random armed robbery or to implicate others (which he, in fact, attempted to do when he was questioned by the police), whereas Davis's immediate attempts to cash a check and his use of Joyce's credit card to purchase clothing were consistent with a separate intent to benefit financially from his crime. While there may be some overlap, the aggravating circumstances were sufficiently independent to justify separate submissions to the jury for its consideration. Here, the trial court divided the evidence in accordance with state law. However, as was the case in Jones, "at best, certain evidence was relevant to two different aggravating factors" and "any risk that the weighing process would be skewed was eliminated by the District Court's instruction that the jury should not simply

34

count the number of aggravating and mitigating factors and reach a decision based on which number is greater but rather should consider the weight and value of each factor." Id. at 399-400 (internal quotation marks and alteration omitted). Accordingly, Davis is not entitled to federal habeas relief on this basis.

IV.

For the foregoing reasons, we affirm the district court's grant of summary judgment to the state. Because the North Carolina Supreme Court's decision was not contrary to, or an unreasonable application of established Supreme Court precedents, nor based on an unreasonable determination of the facts in light of the evidence presented in the state court, Davis is not entitled to federal habeas relief.

AFFIRMED